Kem Thompson Frost, Chief Justice
This appeal arises out of a dispute among the parties concerning the percentage of interest, if any, a purported assignee owns in a limited partnership and in the limited partnership's general partner. Following a jury trial, the trial court disregarded the jury's finding in response to one question, signed a judgment making various declarations as to the purported assignee's interests in the two entities, and awarded trial and appellate attorney's fees to the purported assignee. We conclude that the trial court did not err in disregarding the jury finding. As for the declarations, we conclude that the trial court erred in making some and did not err in making others. We reverse the trial court's judgment and remand for rendition of a new judgment containing declarations consistent with today's opinion. Because our disposition on appeal substantially affects the trial court's judgment, we also reverse and remand the attorney's-fees awards.
I. FACTUAL AND PROCEDURAL BACKGROUND
Appellant Ali Mokaram is an attorney who sometimes invests in real estate. Appellant Osama Abdullatif ("Latif") is involved in commercial-real-estate investment and other ventures. Mokaram and Latif knew each other through friends and family. Mokaram asked Latif to join him in investing in the Beal Bank Building located at 2500 West Loop South in Houston, and Latif agreed. Mokaram and Latif became equal limited partners in appellee Mokaram Latif West Loop, Ltd. ("ML Partnership"), a limited partnership. The general partner in ML Partnership is Mokaram-Latif General, LLC ("ML General"). Mokaram and Latif signed the Company Agreement for ML General, under which Mokaram and Latif are equal *595 members and managers of the limited liability company. ML General, Mokaram, and Latif signed ML Partnership's Agreement of Limited Partnership. Each agreement places restrictions on the transfer of ownership interests and sets forth procedures for admitting new members or limited partners.
ML General owned 1% of ML Partnership and managed ML Partnership. Originally, Mokaram and Latif each owned 49.5% of ML Partnership, and each was a limited partner. Originally, Mokaram and Latif each held a 50% interest in ML General, and they were the only members and only managers of ML General.
Though Mokaram stated that ML Partnership "bought the Beal Bank Building," Mokaram also indicated in his testimony that ML Partnership actually bought an assignment of a 99-year ground lease of the real property on which the Beal Bank Building was constructed.[1] Because Latif lacked cash to fund the down payment for this purchase, Mokaram funded the full down payment.[2] At the time of the purchase, appellee Ali Choudhri leased office space in the Beal Bank Building. Latif introduced Mokaram to Choudhri. Mokaram and Choudhri became friends. They also loaned each other money and engaged in business transactions. Mokaram and Choudhri handled business in an imprecise way.
A. The 2008 Transaction
In 2008, Choudhri purchased a shopping center through Texas REIT, LLC. Choudhri testified that he understood Mokaram and Choudhri to have agreed that Choudhri would give Mokaram a 30% interest in the shopping center owned by Texas REIT in exchange for the following from Mokaram: (1) a 12.5% interest in another real estate venture called 2606 Fannin, LLC ("2606 Fannin"), which allegedly was half of Mokaram's interest in 2606 Fannin, (2) a 25% interest in another property located at 7115 Clarewood Drive (the "Clarewood Property"), which allegedly was half of Mokaram's interest in that property, (3) a 15% interest in the Beal Bank Building, (4) $400,000 in cash, and (4) a one-half interest in Mokaram's Lamborghini Murcielago, an expensive automobile. They sketched out the exchange on a piece of paper that Mokaram and Choudhri each signed on the same day they signed the documents for the transaction:
*596 At Choudhri's instruction, Choudhri's attorney, Bruce Merwin, prepared formal documents for the deal. Merwin created four separate purchase agreements: (1) an agreement under which Mokaram purports to assign, sell, and convey to Choudhri a limited partnership interest in ML Partnership; (2) an agreement under which Mokaram purports to assign, sell, and convey to Choudhri a 12.5% membership interest in 2606 Fannin; (3) an agreement under which Choudhri purports to assign, sell, and convey to Mokaram a 15% membership interest in Texas REIT, LLC; and (4) another agreement under which Choudhri purports to assign, sell, and convey to Mokaram a 15% membership interest in Texas REIT, LLC. Each document contains a merger clause. Mokaram, who did not retain an attorney to represent him in this matter, signed the documents on June 18, 2008. Choudhri also signed the four agreements.
In the agreement under which Mokaram purports to assign, sell, and convey to Choudhri a limited partnership interest in ML Partnership, the parties do not specify how much of a limited partnership interest is being conveyed, but they state that the interests assigned, sold, and conveyed "equal to" the following:
the ownership of 15% of the [the land and improvements located at 2500 West Loop South, Houston, Texas], out of the 30%[3] limited partnership interest in [ML Partnership] owned by [Mokaram], and said [i]nterests equal to the ownership of 25% of the "Clarewood Property" (hereafter defined) out of the 30% limited partnership interest in [ML Partnership] owned by [Mokaram].
The document further recites that the "intended economic effect of this transaction is that the interest owned by [Choudhri] in [ML Partnership] provides for a 15% ownership in [the land and improvements located at 2500 West Loop South, Houston, Texas] and a 25% ownership interest in the Clarewood Property. By way of example, the document illustrates the intended economic effect using a hypothetical sale of the Clarewood Property: "[I]f the Clarewood Property sells for $1 million with debt of $500,000 and closing costs and expenses of $100,000, then the funds distributable to [Choudhri] from the sale would be $100,000 (25% of $400,000)."
*597 B. The 2010 Transaction
By October 2010, the relationship between Latif and Choudhri had deteriorated due to a dispute about a different matter. Latif testified that he did not learn about the 2008 transaction until the fall of 2009 (which Choudhri disputed). Latif refused to acknowledge Mokaram's alleged sale and conveyance of an interest in the ML Partnership to Choudhri in 2008.
Mokaram testified at trial to the events outlined in this paragraph. According to Mokaram, Latif presented Mokaram with an offer to either buy Mokaram's and Choudhri's interests in ML Partnership for $750,000 or sell his own 49.5% interest to Mokaram and Choudhri for $750,000. Mokaram discussed Latif's offer with Choudhri. Mokaram and Choudhri agreed that $750,000 for 50% of the partnership was a good deal because they believed that the Beal Bank Building was worth more than $1.5 million. But, Mokaram lacked the cash to fund the purchase, and Choudhri could not deal with Latif because their relationship was so poor. Mokaram testified that he and Choudhri agreed that Choudhri would give Mokaram $750,000, Mokaram would use the money to buy Latif's 50% interest in ML Partnership, and then they would divide the interest between them (35% to Choudhri and 15% to Mokaram) so that Choudhri and Mokaram would become 50/50 partners.[4] Choudhri would not give Mokaram the cashier's check for $750,000, however, unless Mokaram provided "collateral" by signing four assignments to Choudhri of Mokaram's interests in ML Partnership and ML General.
Choudhri presented Mokaram with four one-page documents (prepared by Merwin) purporting to sell, assign, and transfer to Choudhri the following percentages of Mokaram's interests in ML Partnership and ML General: (1) a 35% limited-partnership interest in ML Partnership; (2) a 35% interest in ML General; (3) a 15% limited-partnership interest in ML Partnership; and (4) a 15% interest in ML General.[5] In each document, Mokaram represents and warrants to Choudhri that the interest "shall be fully and completely transferred to [Choudhri] upon execution of [the assignment], and [Choudhri] shall hereinafter have and possess all beneficial rights and interests incident to the [i]nterest." Each document contains a statement that [a]ll requirements applicable to the transfer of the [i]nterest have been satisfied or, if not satisfied, waived." None of the documents mention any condition precedent. Mokaram signed these four assignment documents on October 29, 2010, as assignor. Mokaram also signed the two assignments of interests in ML Partnership on behalf of ML General, consenting to these two assignments as the general partner of ML Partnership. Mokaram testified that the four assignments (collectively the "Four Assignments") were contingent on Mokaram buying Latif's entire interest in ML Partnership.
According to Mokaram, he communicated the offer to buy Latif's entire interest in ML Partnership for $750,000 to Latif on Sunday, October 31, and Latif said he would get back to them. The next day, Monday, November 1, Mokaram deposited the $750,000 cashier's check from Choudhri *598 into his account. Mokaram claims that, on November 1, Latif told him that he had decided to work things out with Choudhri, that he had changed his mind, and that he did not want to sell his interest in ML Partnership.
Mokaram testified that he returned to Choudhri and told him they did not have a deal with Latif. Mokaram claims that he and Choudhri agreed the Four Assignments were "null and void" and that there were no assignments. Mokaram claims that, at Choudhri's request, Mokaram returned the $750,000 by three checks for $400,000, $225,000, and $125,000. But, Mokaram did not take back the Four Assignments he had signed, have them destroyed, or have Choudhri sign a document confirming that the Four Assignments were void or no longer valid. Choudhri later cashed the first two checks, totaling $625,000, but never cashed the remaining $125,000 check.
Choudhri's version of events differed sharply from Mokaram's, and this paragraph relates Choudhri's testimony regarding the 2010 transaction. According to Choudhri, Latif communicated to Mokaram an offer to pay $750,000 for the interests of Mokaram and Choudhri in ML Partnership, or alternatively, to have Mokaram and Choudhri buy Latif's entire interest in ML Partnership for $750,000. When Mokaram discussed Latif's offer with Choudhri, Mokaram recommended that the two of them accept Latif's offer to sell their interests to Latif and exit the partnership. Mokaram said that he was no longer interested in being in business with Latif and needed the money. Choudhri then decided not to sell, however, and instead offered to buy Mokaram's 35% interest in ML Partnership for $750,000, which would make Choudhri a 50% owner with Latif.[6] According to Choudhri, Mokaram agreed and suggested that Merwin prepare the documents so that Mokaram could obtain the money right away. Mokaram also asked that Choudhri pay him the $750,000 by cashier's check for his interests. Choudhri claimed that the two checks totaling $625,000 that Mokaram later gave him were not related to the Four Assignments. Choudhri denied receiving a $125,000 check from Mokaram. Choudhri maintained that $575,000 of the $625,000 was to settle a fraud claim that Choudhri had against Mokaram regarding 2606 Fannin, and that the remaining $50,000 was to repay Choudhri what Mokaram owed him from the 2008 transaction.
Choudhri testified that he learned about the fraud claim regarding 2606 Fannin after October 29, 2010, the date on which he gave Mokaram the cashier's check for $750,000, so there would have been no way to deduct the alleged settlement amount from the $750,000 he gave to Mokaram. There was no written agreement documenting a $575,000 settlement between them. The only supporting evidence for a $575,000 transaction appeared in Choudhri's 2010 tax return-filed in 2012 after this lawsuit had begun-reflecting a gross sale price of $575,000 for the "2606 Fannin Properti[es]." Before that, however, Choudhri had sought loans from two different banks, and in connection with the loan applications he had submitted unfiled tax returns prepared in 2011 and 2012 that did not reflect any such transaction.
Sometime after Choudhri cashed the two checks totaling $625,000 in November 2010, John Leontaritis, a mutual friend of Choudhri and Mokaram, met with Choudhri and Mokaram in an effort to get them to resolve their disputes. Leontaritis testified *599 that during the meeting, Choudhri was still upset about 2606 Fannin and that Choudhri said Mokaram still owed Choudhri money based on 2606 Fannin. Leontaritis also testified that before this meeting, Choudhri told him that Mokaram had given Choudhri three checks, that Choudhri had cashed two of the checks, and that Choudhri did not cash the other check (for $125,000) because the check "got lost."
C. Execution of the Consent
In January 2011, Choudhri and his father met with Latif in an attempt to settle a dispute about a different matter. Choudhri brought a proposed "Consent to Transfer" document with him. The document, which Merwin had drafted, did not specify what interest Mokaram had sold to Choudhri, but provided for Latif's irrevocable consent to "any transfers heretofore made by [Mokaram] to [Choudhri] and/or an entity owned by [Choudhri] of a limited partnership interest in [ML Partnership] and a membership interest in [ML General]." Under the terms of the consent, Latif confirmed that, "with respect to any of his rights under the organizational documents relating to [ML General] and [ML Partnership], all requirements to the above-described transfers from [Mokaram] to [Choudhri] have been satisfied or, if not satisfied, waived." Latif signed the consent on January 22, 2011, individually "and in the capacity of a manager and member of [ML General] ... and "as a limited partner in [ML Partnership]" with the handwritten notation "subject to the agre[e]ment between [Mokaram] and [Choudhri]."
Latif testified that he understood he was consenting to the 2008 transaction and waiving his right of first refusal. He testified that at that time, he was relying on Choudhri's statement that Choudhri had acquired only 15% of ML Partnership. Latif denied knowing that Mokaram had signed the Four Assignments. Choudhri asserts that the consent covers the 2008 transaction and the 2010 transaction.
D. The Litigation
In May 2012, a dispute arose regarding the attempt by Choudhri's sister's medical group to rent space and move the group's office to the Beal Bank Building. ML Partnership filed this lawsuit against Choudhri and a construction contractor, seeking a temporary restraining order, a temporary injunction, and a permanent injunction to prevent these defendants from demolishing or otherwise remodeling any part of the Beal Bank Building, claiming an interest in the building, ML Partnership, or ML General, and transacting business on behalf of ML Partnership or on behalf of ML General. The partnership also sought a declaratory judgment that (1) Mokaram and Latif are both 49.5% limited partners in ML Partnership, and ML General is a 1% general partner in ML Partnership, and (2) Mokaram and Latif both own a 50% membership interest in ML General and are members in that company.[7]
Choudhri answered the suit, asserted a counterclaim, and joined Latif as a third-party defendant. Choudhri sought a constructive trust, a receivership, and an accounting. He also asserted a claim against Latif for breach of fiduciary duty, and requested declaratory relief, including a declaratory judgment that he is a limited partner of ML Partnership and a member of ML General.
Mokaram intervened in the lawsuit, seeking declaratory relief concerning his *600 ownership interests in ML Partnership and ML General. He also sought a declaration that the Four Assignments in 2010 were contingent on a condition precedent that never occurred-the purchase of Latif's interest in ML Partnership and ML General. In his original petition in intervention, Mokaram acknowledged assigning Choudhri a 15% interest in the ML Partnership in 2008.
Mokaram later amended his intervention pleading to seek rescission of the 2008 transaction based on Choudhri's alleged intentional misrepresentation of the value of Texas REIT to induce Mokaram to enter into the 2008 transaction. Mokaram also asserted claims against Choudhri for common-law fraud, statutory fraud, breach of fiduciary duty, and securities fraud in violation of the Texas Securities Act.
Choudhri counterclaimed against Mokaram, alleging that he conspired with Latif to divert partnership funds and breached fiduciary duties. Choudhri later amended his pleadings to assert additional claims against Latif and Mokaram.
Latif's Acquisition of Mokaram's Claims and Interests
In December 2012, Latif purchased all of Mokaram's right, title, and interest in and to ML Partnership and ML General, along with all of Mokaram's rights relating to these ownership interests, including Mokaram's claims in this lawsuit against Choudhri relating to these interests. Mokaram agreed to prosecute his claims against Choudhri in this lawsuit, and Latif agreed to pay the reasonable attorney's fees, costs, and expenses incurred by Mokaram to prosecute these claims. Mokaram also agreed to resign immediately as a manager of ML General. Latif agreed that the assignments of interests by Mokaram to Latif are subject to Choudhri's contentions in this lawsuit that Choudhri owns all of the interests in ML Partnership and ML General originally owned by Mokaram.
Pretrial Orders
The trial court signed an agreed order on December 5, 2012, (1) appointing a master in chancery, (2) prohibiting ML Partnership and its agents and partners from engaging in certain actions before rendition of the trial court's final judgment, and (3) ordering that the claims designated as Phase I claims be tried first and separately from the other claims. The trial court later amended the definitions of Phase I claims and the other claims.
The Phase I Trial
Shortly before the Phase I trial, the trial court signed an order aligning Choudhri as the plaintiff and Latif and Mokaram (collectively the "Latif Parties") as the defendants for the Phase I trial. The Phase I trial lasted over two weeks. The trial court submitted questions to the jury concerning Choudhri's claim that Mokaram converted Choudhri's interest in the Lamborghini, and Mokaram's claim that Choudhri committed securities fraud in the 2008 transaction, upon which Mokaram sought rescission of the 2008 transaction. The court also submitted the following question concerning the 2010 transaction:
QUESTION NO. 3
Did Mokaram and Choudhri agree that the 2010 assignment was not effective and that Mokaram would return the $750,000.00 paid by Choudhri?
The jury answered "yes" to Question 3. The jury found against Mokaram on his securities-fraud claim and failed to find any damages as to Choudhri's conversion claim.
The trial court signed an interlocutory judgment on the Phase I claims. The trial *601 court's interlocutory judgment deferred trial of attorney's fees and other issues until a later date.
The Phase I Final Judgment
After a hearing on attorney's fees, the trial court signed a Phase I final judgment in which the trial court ruled as follows:
(1) The trial court adjudged that Choudhri recover $50,000 plus prejudgment interest from Mokaram based on a thirty-day loan Mokaram had not repaid.
(2) The trial court ordered that Mokaram take nothing against Choudhri based on Mokaram's Phase I claims.
(3) The trial court decreed that Latif take nothing against Choudhri based on Latif's Phase I claims.
(4) The trial court granted Choudhri's motion to disregard the jury's answer to Question 3.
(5) The trial court denied Latif's motion for directed verdict.
(6) The trial court awarded Choudhri judgment against the Latif Parties, jointly and severally for Phase I attorney's fees and expenses for work in the trial court as well as conditional awards for work on appeal.
(7) The trial court ordered that attorney's fees relating to receivership applications and the defense of such applications be reserved for determination in Phase II, but otherwise, the trial court denied any relief requested by the parties in their Phase I claims to the extent the relief was not granted in the final judgment.
(8) The trial court severed all remaining issues into a separate case to make the Phase I judgment final.
(9) The trial court taxed all court costs against the Latif Parties.
In its final judgment, the trial court also made the following declarations:
• "[S]ince June 18, 2008, Choudhri has owned 15% [of] [ML Partnership] and 15% of [ML General][.]"
• "[A]s of October 29, 2010, Choudhri has owned a total (not additional) 49.5% of [ML Partnership] and a total (not additional) 50% of [ML General], with all beneficial rights and interest in the Beal Bank Entities [ML Partnership and ML General] that flow from such ownership, including Choudhri's status as a manager of [ML General] from and after October 10, 2010."
• "The only other owner of interest in [ML Partnership and ML General] from and after October 29, 2010 is [Latif], whose ownership interest in these entities is equal to that of Choudhri from and after October 29, 2010."
• "The October 29, 2010 assignments of interest in these entitles from Mokaram to Choudhri and [Latif's] consent to any transfer of interest in these entities from Mokaram to Choudhri are valid and enforceable."
The trial court denied Mokaram's and Latif's post-judgment motions. They now challenge the judgment in this appeal.
II. ISSUES AND ANALYSIS
Latif and Mokaram contend that the trial court erred by (1) disregarding the jury's finding in response to Question 3, (2) rendering judgment for Choudhri on his declaratory-judgment claim, (3) rendering judgment that Choudhri is a manager of ML General, (4) refusing to clarify what ownership rights Choudhri has in ML Partnership and ML General, (5) misstating the amount of the interests Choudhri acquired in ML Partnership, and (6) awarding attorney's fees to Choudhri.
*602 A. Did the trial court err in disregarding the jury's finding in response to Question 3?
In their first issue, the Latif Parties contend that the trial court erred in disregarding the jury's finding in response to Question 3. In this finding the jury answered "yes" to the following inquiry, which the trial court submitted along with the listed instructions:
Did Mokaram and Choudhri agree that the 2010 assignment was not effective and that Mokaram would return the $750,000.00 paid by Choudhri?
An agreement is a legal relationship creating obligations between two or more parties. To form a valid agreement, the parties must have the same understanding of the subject matter of the agreement and all of its essential terms. An agreement may be oral, in writing or both.
In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.
The trial court did not define the singular term "2010 assignment" in Question 3 in the court's charge. In October 2010, Mokaram signed four separate assignments. In each assignment, Mokaram recites that he "sells, assigns, and transfers unto [Choudhri]" the specified interest. In each document, Mokaram represents and warrants to Choudhri that the interest "shall be fully and completely transferred to [Choudhri] upon execution of [the assignment], and [Choudhri] shall hereinafter have and possess all beneficial rights and interests incident to the [i]nterest."
In construing each of the Four Assignments, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in each assignment. See Kelley-Coppedge, Inc. v. Highlands Ins. Co. , 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire instrument in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co. , 995 S.W.2d 647, 652 (Tex. 1999). Whether an assignment is ambiguous is a question of law for the court. See Heritage Res., Inc. v. NationsBank , 939 S.W.2d 118, 121 (Tex. 1996). The instrument is ambiguous if its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. See ids="10015425" index="3" url="https://cite.case.law/sw2d/939/118/#p121">id. Yet, if the court determines that the wording can be given a certain or definite legal meaning or interpretation, then the court will deem the assignment unambiguous and construe it as a matter of law. Am. Mfrs. Mut. Ins. Co. v. Schaefer , 124 S.W.3d 154, 157 (Tex. 2003). We cannot rewrite the assignment or add to its language under the guise of interpreting it. See ids="9291627" index="5" url="https://cite.case.law/sw3d/124/154/#p157">id. at 162.
Under the unambiguous language of each of the Four Assignments, each assignment is effective immediately, and no assignment is contingent on any condition, including the condition that Mokaram or Choudhri purchase Latif's entire interest in ML Partnership and ML General. Although Mokaram testified at trial to an alleged oral condition under which Mokaram and Choudhri agreed that none of the assignments would be effective unless Mokaram purchased Latif's interest in ML Partnership, the Four Assignments contain no language imposing such a condition. Because this parol evidence as to a prior or contemporaneous agreement to this condition contradicts the plain meaning of each of the Four Assignments, the law deems this evidence incompetent to change the unambiguous language of the *603 Four Assignments. See White Oak Operating Co., LLC v. BLR Const. Cos., LLC, 362 S.W.3d 725, 734 (Tex. App.-Houston [14th Dist.] 2011, no pet.).
In his motion to disregard the jury's finding in response to Question 3, Choudhri asserted that the parol evidence rule bars enforcement of this alleged oral condition. On appeal, the Latif Parties do not challenge this parol-evidence argument; instead, they contend that in response to Question 3, the jury found that, after execution of the Four Assignments, Mokaram and Choudhri entered into an agreement to rescind the Four Assignments, under which the parties agreed that the assignments were ineffective and Mokaram agreed to return the $750,000 to Choudhri. The Latif Parties argue that the parol-evidence rule does not bar enforcement of this rescission agreement because the parties entered into the agreement after the execution of the Four Assignments. In his motion to disregard the jury's finding in response to Question 3, Choudhri asserted, among other things, that this finding was immaterial. Choudhri asserted that in submitting Question 3 the trial court did not submit the question of whether the parties entered into an agreement after Mokaram executed the Four Assignments.
A trial court may disregard a jury finding if the finding is unsupported by the evidence or if the finding is immaterial. Green Intern., Inc. v. Solis , 951 S.W.2d 384, 389-90 (Tex. 1997). The answer to a question is immaterial when (1) the question should not have been submitted, (2) the question calls for a finding beyond the province of the jury, such as a question of law, (3) when the question was properly submitted but has been rendered immaterial by other findings, or (4) when the answer to the question cannot alter the effect of the verdict. See Se. Pipe Line Co. v. Tichacek , 997 S.W.2d 166, 172 (Tex. 1999) ; City of Brownsville v. Alvarado, 897 S.W.2d 750, 752 (Tex. 1995).
Under the Latif Parties' rescission-agreement theory, after Mokaram executed the four immediately effective assignments in October 2010, Mokaram and Choudhri agreed that these assignments would be ineffective and that Mokaram would return to Choudhri the $750,000 that Choudhri had given Mokaram. If the alleged oral condition to which Mokaram testified were enforceable, the condition never occurred, and therefore the Four Assignments never became effective and there would be nothing to rescind. If Mokaram and Choudhri thought there was a valid oral condition to the effectiveness of each of the Four Assignments, and if they both concluded that the oral condition was not going to occur, it would make sense that they would agree with each other that the Four Assignments were not effective and that Mokaram should return the $750,000 that Choudhri had given him to buy Latif's interest. Indeed, Mokaram testified to this effect at trial:
A. So I told Mr. Choudhri, this is not a-we don't have a deal. And he said, okay, well, I guess just give me my money back. And it was very clear, he understood, we both agreed that there was no deal. That's what occurred.
...
Q. Did he agree there were no assignments and no transfer and that you would give him his money back?
A. There was never any transfers or assignments because the condition that had to occur never occurred. It was very clear, he knew it, I knew it. We both had an-you know, we agreed that it didn't occur ...
Q. So, after Mr. Latif said, no, my question is: What did Mr. Choudhri *604 agree with respect to the assignments and the transfer and the money?
A. That they were null and void, that they didn't exist, that there was no agreement.
Q. And after that, what did he agree to with respect to the money?
A. He took it. He accepted it back 'cause it was his funds, there was no sale. I didn't owe him money. I was very clear, here's your money back.
Q. Before he took it, what did he agree to, though?
A. He agree[d] that there was [sic] no assignments, there was no transfer of anything.[8]
But, this "agreement" is an agreement as to the non-occurrence of the oral condition and thus the failure of any of the Four Assignments to take effect. The trial court should not have submitted any question inquiring into the enforceability of the oral condition. See White Oak Operating Co. , 362 S.W.3d at 734. Rather than try to enforce this oral condition, the Latif Parties assert a subsequent-agreement theory. Under this theory, Mokaram and Choudhri allegedly entered into an agreement rescinding the Four Assignments some time after the assignments took effect upon execution. The parol-evidence rule would not bar such a subsequent agreement to rescind, and we presume that the trial court properly could have submitted a jury question about this alleged subsequent agreement. See First Bank v. Brumitt , 519 S.W.3d 95, 111 (Tex. 2017) (stating that "the parol-evidence rule does not apply to agreements made subsequent to the written agreement") (internal quotations omitted).
We conclude that in Question 3 the trial court did not ask the jury to determine whether Mokaram and Choudhri entered into a subsequent agreement. Even presuming for the sake of argument that Question 3, which asks about a single assignment, referred to all of the Four Assignments, the question does not ask the jury to determine whether, after execution of the Four Assignments, Mokaram and Choudhri agreed to rescind the Four Assignments. The trial court did not ask the jury whether the parties agreed to rescind four already-executed-and-effective assignments. Nor did the trial court ask the jury whether the parties agreed that the Four Assignments would no longer be effective. Instead, in Question 3, the trial court asked the jury to determine whether Mokaram and Choudhri agreed that the 2010 assignment "was not effective" and that Mokaram would return the $750,000 to Choudhri. Under the unambiguous language of Question 3, the question did not submit the subsequent-agreement theory, nor did it plainly attempt to request a finding on a subsequent-agreement cause of action. See Torrington Co. v. Stutzman , 46 S.W.3d 829, 839-40 (Tex. 2000) (discussing cases in which the Supreme Court of Texas found a question to be defective, rather than immaterial, because the question plainly attempted to request a finding on a cause of action). Question 3 appears to implicitly include an inquiry as to whether the parties agreed that the alleged oral condition was enforceable and thus the assignments were never effective. But, as a matter of law, this oral condition violates the parol-evidence rule and is not enforceable. See White Oak Operating Co. , 362 S.W.3d at 734. So, Question 3 should not have been submitted, and the law deems it *605 immaterial.[9] See Ulico Cas. Co. v. Allied Pilots Ass'n , 262 S.W.3d 773, 787 (Tex. 2008) ; Nat'l Plan Adm'rs v. Nat'l Health Ins. Co. , 235 S.W.3d 695, 703-04 (Tex. 2007).
The Latif Parties assert that Question 3 tracks Pattern Jury Charge 101.1 on the existence of an agreement. See Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business Consumer Insurance Employment PJC 101.1 (2010) ("Did Paul Payne and Don Davis agree [insert all disputed terms] ?"). Because PJC 101.1 does not speak to the substance of the parties' agreement, the use of this form does not indicate the nature of the agreement that the jury was asked to find. See ids="8370069" index="16" url="https://cite.case.law/sw3d/235/695/#p703">id.
The Latif Parties assert that Choudhri did not object to the form of Question 3. At the charge conference, Choudhri objected that no evidence and no pleadings supported the submission of Question 3. Choudhri also objected that if the trial court was going to submit a question, the court should submit a novation question. Choudhri tendered a proposed novation question, and the trial court refused to submit the question. Even presuming that none of Choudhri's objections to the form of Question 3 had merit, the trial court still could disregard the jury's answer to this question based on the question's immateriality, because an objection at the charge conference is not required for the trial court to disregard the jury's finding based on the question's immateriality. See Nat'l Plan Adm'rs , 235 S.W.3d at 704 (concluding that party was not required to object to jury question to argue that it was immaterial); Oliver v. Oliver , 889 S.W.2d 271, 273-74 (Tex. 1994).
Our dissenting colleague concludes that the trial evidence raised a fact issue as to whether Mokaram and Choudhri agreed to rescind the Four Assignments after Mokaram executed the assignments. See post at 619-20. Our colleague bases this determination on Mokaram's conclusory testimony as to Choudhri's agreement that the assignments were "null and void" and that there was no agreement and no transfer of anything. See ids="10003472" index="19" url="https://cite.case.law/sw2d/889/271/#p273">id. Mokaram did not testify as to the words Choudhri spoke; instead, Mokaram made conclusory statements about the matters to which Choudhri allegedly agreed. These conclusory statements do not raise a genuine fact issue as to whether Mokaram and Choudhri agreed to rescind the Four Assignments after Mokaram executed the assignments. See Elizondo v. Krist , 415 S.W.3d 259, 264 (Tex. 2013) ; Lenox Barbeque and Catering, Inc. v. Metro. Transit Auth. of Harris County , 489 S.W.3d 529, 532 & n.3 (Tex. App.-Houston [14th Dist.] 2016, no pet.). The trial evidence would not enable reasonable and fair-minded people to find *606 that Mokaram and Choudhri agreed to rescind the 2010 transaction, thus setting aside the 2010 Mokaram-to-Choudhri assignments. See Lenox Barbeque and Catering, Inc. , 489 S.W.3d at 532 & n.3 ; Entrust, Inc. v. Rice Dist. Community Hospital , No. 14-14-00196-CV, 2015 WL 5458980 at *7-*8 (Tex. App.-Houston [14th Dist.] Sept. 17, 2015, no pet.) (mem. op.).
Our dissenting colleague also suggests, based on statements by Mokaram's counsel, that there was no dispute that the Four Assignments were valid. See post at 622-23---. Yet, Mokaram testified at trial that the Four Assignments never took effect because the alleged oral condition never occurred. Mokaram testified that "[t]here was never any transfers or assignments because the condition that had to occur never occurred. It was very clear, he knew it, I knew it. We both had an-you know, we agreed that it didn't occur."
Based on the immateriality of Question 3, the trial court did not err in granting Choudhri's motion to disregard the jury's finding in response to Question 3. See Ulico Cas. Co. , 262 S.W.3d at 787 ; Nat'l Plan Adm'rs , 235 S.W.3d at 703-04. Accordingly, we overrule the Latif Parties' first issue.[10]
B. Did the trial court lack subject-matter jurisdiction over Choudhri's requests for declaratory relief regarding ML General?
On appeal, Latif has filed a "Motion to Partially Dismiss Cause," in which he argues that the trial court lacked subject-matter jurisdiction over Choudhri's requests for declaratory relief regarding his ownership interest in ML General, his alleged status as a member and manager of ML General, and his alleged rights under ML General's company agreement. Under the Texas Declaratory Judgments Act, a party seeking declaratory relief must join as parties all persons who have or claim any interest that would be affected by the declaratory relief sought. See Tex. Civ. Prac. & Rem. Code § 37.006(a) (West 2015). ML General has never been a party to this litigation. Therefore, Latif contends, the trial court lacked subject-matter jurisdiction to grant declaratory relief regarding ML General, and this court should vacate that part of the trial court's judgment and dismiss the Latif Parties' appeal of this part of the judgment for lack of jurisdiction.
Though Choudhri should have joined ML General as a party, his failure to do so did not deprive the trial court of subject-matter jurisdiction over the declaratory-judgment claims regarding ML General; instead, this failure means that the trial court's declaratory judgment does not bind ML General. See Tex. Civ. Prac. & Rem. Code § 37.006(a) (West 2015) (stating that a trial court's declaratory judgment does not prejudice the rights of a person not a party to the proceeding); Brooks v. Northglen Ass'n , 141 S.W.3d 158, 162-63 (Tex. 2004) (stating that failure to join all interested parties in declaratory-judgment action does not deprive the trial court of jurisdiction to grant declaratory relief but that, under section 37.006, the declaratory judgment does not bind nonparties); Shelton v. Kalbow , 489 S.W.3d 32, 43 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) (holding that failure to join party under section 37.006(a) of the Declaratory Judgments Act did not deprive the trial court of jurisdiction over claim for declaratory *607 relief). An actual controversy exists between the Latif Parties and Choudhri as to Choudhri's entitlement to this declaratory relief. See In re C.C.E. , 530 S.W.3d 314, 318-19 (Tex. App.-Houston [14th Dist.] 2017, no pet.). Choudhri is a plaintiff whose rights may be declared by the trial court, and the trial court's declaratory judgment binds the parties to this litigation. See Tex. Civ. Prac. & Rem. Code § 37.006(a) ; Brooks , 141 S.W.3d at 161-64 ; In re C.C.E. , 530 at 318-19.
The trial court had subject-matter jurisdiction over Choudhri's requests for declaratory relief, and we have jurisdiction over the Latif Parties' appeal from the trial court's judgment granting declaratory relief. Thus, we deny Latif's motion to dismiss.
C. Did the trial court err in declaring that Choudhri owns an interest in ML General?
Under their second issue, the Latif Parties assert that the trial court erred in rendering declaratory judgment that "since June 18, 2008, Choudhri has owned ... 15% of [ML General], and that as of October 29, 2010, Choudhri has owned ... a total (not additional) 50% of [ML General]." They correctly point out that Choudhri did not ask the trial court to submit any jury questions on this relief and that the trial court did not charge the jury on these issues. Therefore, to show that the trial court erred in granting this declaratory relief, the Latif Parties must establish that the trial evidence did not conclusively prove Choudhri's entitlement to this relief. See Tex. Civ. Prac. & Rem. Code Ann. § 37.007 (West 2015) (stating that, if a proceeding under the Texas Declaratory Judgments Act involves the determination of a fact issue, the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions); Tex. R. Civ. P. 279 (stating that "[u]pon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived"); DiGiuseppe v. Lawler , 269 S.W.3d 588, 598-99 (Tex. 2008) (noting that, under Texas Rule of Civil Procedure 279, if no element of an independent ground of recovery is included in the jury charge without request or objection, the ground of recovery is waived unless the ground of recovery is conclusively established by the evidence).
The Latif Parties argue that the trial evidence does not conclusively prove Choudhri's entitlement to this declaratory relief. Choudhri disagrees, and he cites the four 2008 agreements, the Four Assignments, and the 2011 consent, alleging that the unambiguous terms of these documents show his ownership of the interests the trial court declared in its judgment.
1. The 2008 Agreements
The Latif Parties argue that in the four 2008 agreements, Mokaram does not purport to transfer, assign, sell, or convey to Choudhri any interest in ML General. In one of these agreements, Mokaram purports to assign, sell, and convey to Choudhri a limited partnership interest in ML Partnership. In another, Mokaram purports to assign, sell, and convey to Choudhri a 12.5% membership interest in 2606 Fannin. In each of the other two 2008 agreements, Choudhri purports to assign, sell, and convey to Mokaram a 15% membership interest in Texas REIT. In the agreement regarding the assignment of a limited partnership interest in ML Partnership, the parties recite that the assigned interests equal ownership of 15% of the "West Loop Property" ... and ... ownership of 25% of the "Clarewood Property. " The parties to this agreement define *608 "West Loop Property" to mean "the land and improvements located at 2500 West Loop South, Houston, Harris County, Texas 77027," and thus the definition includes the Beal Bank Building.
In the agreement, the parties state that ML Partnership owns both the land and the improvements located at 2500 West Loop South in Houston. Mokaram indicated in his trial testimony that ML Partnership bought an assignment of a 99-year ground lease of the real property at this location, and thus does not own the land and improvements there. Regardless of the nature of ML Partnership's ownership interest, no trial evidence showed that either Mokaram or ML General has owned the land or the improvements at 2500 West Loop South.[11]
In the agreement, the parties state that ML Partnership owns the Clarewood Property. Nonetheless, evidence at trial showed that, before the parties signed the four 2008 agreements, ML Partnership had transferred whatever interest ML Partnership owned in the Clarewood Property to Latif in his individual capacity. Regardless of the nature of ML Partnership's ownership interest in the Clarewood Property, no trial evidence showed that either Mokaram or ML General has owned the Clarewood Property.[12]
The text of this agreement indicates that the parties thought that ML Partnership owned the West Loop Property and the Clarewood Property and that they intended that Choudhri receive an indirect 15% ownership interest in the West Loop Property and an indirect 25% ownership interest in the Clarewood Property. Even if ML Partnership owned the West Loop Property and the Clarewood Property at the time of the 2008 transaction, that would not mean that ML General holds any ownership interest in either of the properties. Transferring to Choudhri an interest in ML General would not provide Choudhri with (1) a direct or indirect 15% ownership interest in the West Loop Property, or (2) a direct or indirect 25% ownership interest in the Clarewood Property.
We conclude that, under the unambiguous language of the 2008 agreements and under the handwritten description to which Mokaram and Choudhri agreed,[13] Mokaram did not purport to assign, sell, or convey to Choudhri any interest in ML General in the 2008 transaction.[14] The trial evidence did not conclusively prove that Mokaram assigned, sold, or conveyed to Choudhri any interest in ML General in 2008. Therefore, the trial court erred in declaring that "since June 18, 2008, Choudhri has owned ... 15% of [ML General]." See Kehoe v. Pollack , 526 S.W.3d 781, 795-97 (Tex. App.-Houston [14th Dist.] 2017, no pet.).
2. The 2010 Assignments
In two of the Four Assignments that Mokaram signed on October 29, 2010, Mokaram purported to sell, assign, and transfer to Choudhri membership interests in ML General. The two assignments are substantially similar, except that in one *609 assignment Mokaram purports to assign a 15% membership interest in ML General and in the other Mokaram purports to assign a 35% membership interest in ML General.
ML General's company agreement restricts each member's ability to transfer the member's interest in ML General. Paragraph 13.01 of the company agreement provides as follows:
Limited Right to Transfer. No Member or Assignee shall make any Transfer[15 ] of all or any part of its Membership Interest, whether now owned or hereafter acquired, except (a) with a Super Majority of the Members; (b) as provided by Article XIV of this Agreement; (c) as a Defaulting Member as provided by paragraph 15.01(f) of this Agreement; or (d) upon winding up or termination, as provided by paragraph 16.03 of this Agreement. Any attempted Transfer by a person of an interest or right, or any part thereof, in or in respect of the Company other than as specifically provided by this Agreement shall be, and is hereby declared, null and void ab initio.
Under paragraph 1.01 the parties defined "Super Majority" to mean one or more Members having more than 66.67% of the Percentage Interests of all Members of ML General. Thus, under paragraph 13.01(a), in October 2010, Mokaram was able to transfer or assign to Choudhri all or part of his membership interest in ML General if Mokaram and Latif approved the transaction. Presuming that Mokaram approved the transfer of all of his membership interest in ML General to Choudhri by his execution of the two assignments, the record contains no evidence that Latif approved these two assignments on or before October 29, 2010. Nor does the record contain any evidence that either of the assignments fell within subsections (b), (c), or (d) of paragraph 13.01. Thus, under paragraph 13.01, Mokaram's attempt on October 29, 2010, to sell, assign, and transfer to Choudhri all of Mokaram's membership interest in ML General was "null and void ab initio. " See OAIC Commercial Assets, LLC v. Stonegate Village, L.P. , 234 S.W.3d 726, 738-41 (Tex. App.-Dallas 2007, pet. denied) (holding that purported transfer of limited partnership interest was null and void under the unambiguous language of the limited partnership agreement).
Choudhri relies upon the 2011 consent, which Latif signed in his capacity as a member and manager of ML General. Under this instrument, Latif irrevocably consented to "any transfers heretofore made by [Mokaram] to [Choudhri] and/or an entity owned by [Choudhri] of a ... membership interest in [ML General]." Latif also confirmed that, "with respect to any of his rights under the organizational documents relating to [ML General] ... all requirements to the above-described transfers from [Mokaram] to [Choudhri] have been satisfied or, if not satisfied, waived." The Latif Parties assert that a void act cannot be ratified or validated after the fact and therefore the consent did not breathe life into the Four Assignments which were "null and void ab initio. "
The provisions of ML General's company agreement are unambiguous, and we must enforce them as written. See David J. Sacks, P.C. v. Haden , 266 S.W.3d 447, 450 (Tex. 2008) (per curiam). Our role is not to question the wisdom of the parties' agreement or to rewrite its provisions *610 under the guise of interpreting it. See Am. Mfrs. Mut. Ins. Co. , 124 S.W.3d at 162 ; Helmerich & Payne Intern. Drilling Co. v. Swift Energy Co., 180 S.W.3d 635, 646 (Tex. App.-Houston [14th Dist.] 2005, no pet.). We give each term in the agreement its plain, ordinary, and generally accepted meaning unless the agreement itself shows the term to be used in a technical or different sense. Heritage Res., Inc., 939 S.W.2d at 121-22. The company agreement does not show that the parties used the term "null and void ab initio " in a technical sense or a sense different from its plain, ordinary, and generally accepted meaning. Under this meaning, an attempted transfer that is "null and void ab initio " never has any effect and never binds any party. See Brazzel v. Murray , 481 S.W.2d 801, 803 (Tex. 1972). It is as if it never even happened.
Under the plain, ordinary, and generally accepted meaning of this term, a party cannot give life to a null and void attempted transfer by ratifying, confirming, or consenting to the attempted transfer or by purporting to waive its nullity. See Brazzel , 481 S.W.2d at 803 ("A void act is one entirely null within itself, not binding on either party, and which is not susceptible of ratification or confirmation. Its nullity cannot be waived.") (quoting Murchison v. White, 54 Tex. 78, 81 (1880) ) (internal quotations omitted); Harris v. Archer , 134 S.W.3d 411, 427 (Tex. App.-Amarillo 2004, pet. denied) (stating that "a void contract cannot be ratified"); Jack v. State , 694 S.W.2d 391, 397 (Tex. App.-San Antonio 1985, writ ref'd n.r.e.) (stating that a void contract is "not subject to ratification").
Under the unambiguous language of the company agreement, the two purported assignments of membership interests in 2010 are null and void and were null and void from the outset, so they never can be effective.[16] See Brazzel , 481 S.W.2d at 803 ; Murchison , 54 Tex. at 81 ; Harris , 134 S.W.3d at 427 ; Jack , 694 S.W.2d at 397. If, after October 2010, Latif and Mokaram both approved an assignment of all of Mokaram's membership interest in ML General to Choudhri, the proper course under the company agreement would have been to document this approval and have Mokaram execute another assignment document that would not be null and void ab initio. The trial evidence does not show that this action occurred. The trial evidence did not conclusively prove that Mokaram assigned, sold, or conveyed to Choudhri any interest in ML General by means of the Four Assignments in 2010 or by the 2011 consent. Nor did the trial evidence conclusively prove that Choudhri ever acquired ownership of any interest in ML General. See Brazzel , 481 S.W.2d at 803 ; Murchison , 54 Tex. at 81 ; Harris , 134 S.W.3d at 427 ; Jack , 694 S.W.2d at 397. Therefore, the trial court erred in declaring that "as of October 29, 2010, Choudhri has owned ... a total (not additional) 50% of [ML General], with all beneficial rights and interests in [ML General] that flow from such ownership, including Choudhri's status as a manager of [ML General] from and after October 10, 2010." See Kehoe , 526 S.W.3d at 795-97. The trial court also erred to the extent it declared that (1) from and after October 29, 2010, the only owner of interest in ML General other than Choudhri is Latif; (2) from and after October 29, 2010, Latif's ownership interest *611 in ML General is equal to that of Choudhri; and (3) the October 29, 2010 assignments of interest in ML General and Latif's consent to any transfers of interest in ML General are valid and enforceable. See ids="12408652" index="52" url="https://cite.case.law/sw3d/526/781/#p795">id. Accordingly, we sustain the Latif Parties' second issue to the extent the Latif Parties challenge the trial court's declarations regarding Choudhri's purported ownership of any interest in ML General. We sustain the Latif Parties' third issue in which they challenge the trial court's declaration that Choudhri has been a manager of ML General since October 29, 2010. We also sustain the Latif Parties' fifth issue to the extent that they argue (1) the trial court erred in stating that Choudhri has owned a 15% interest in ML General since June 18, 2008, and (2) the trial court erred in declaring that Choudhri has been a manager of ML General since October 29, 2010.
D. Did the trial court err in declaring that Choudhri owns an interest in ML Partnership?
Under their second issue, the Latif Parties also assert that the trial court erred in rendering declaratory judgment that "since June 18, 2008, Choudhri has owned 15% [of] [ML Partnership], ... and that as of October 29, 2010, Choudhri has owned a total (not additional) 49.5% of [ML Partnership]." They correctly point out that Choudhri did not ask the trial court to submit any questions to the jury regarding this relief and that the trial court did not charge the jury on these issues. So, to show that the trial court erred in granting this declaratory relief, the Latif Parties must establish that the trial evidence did not conclusively prove Choudhri's entitlement to this relief. See Tex. Civ. Prac. & Rem. Code Ann. § 37.007 ; Tex. R. Civ. P. 279 ; DiGiuseppe , 269 S.W.3d at 598-99.
The Latif Parties argue that the trial evidence does not conclusively prove Choudhri's entitlement to the declaratory relief. Choudhri disagrees, and he cites to the four 2008 agreements, the Four Assignments, and the 2011 consent, alleging that the unambiguous terms of these documents show his ownership of the interests the trial court declared in its judgment.
1. The 2010 Assignments
In two of the Four Assignments that Mokaram signed on October 29, 2010, Mokaram purported to sell, assign, and transfer to Choudhri limited partnership interests in ML Partnership. Though substantially similar, the two assignments differ in the size of the limited partnership interest purportedly assigned. In one assignment Mokaram purports to assign a 15% limited partnership interest in ML Partnership, and in the other he purports to assign a 35% limited partnership interest in ML Partnership.
a. Restrictions in the Partnership Agreement
ML General's limited partnership agreement (the "Partnership Agreement") restricts each limited partner's ability to transfer all or part of his limited partnership interest in ML Partnership. In section 10.1 of the Partnership Agreement, the parties agree that unless otherwise provided in the Partnership Agreement, "no [l]imited [p]artner may transfer all or any portion of such Partner's interest in the Partnership, without the prior consent of the [g]eneral [p]artner, which consent may be granted or withheld in the sole discretion of the [g]eneral [p]artner."
In section 10.2 of the Partnership Agreement, the parties agree that, if a limited partner receives a bona fide offer for the purchase of all or part of his interest in ML Partnership, the limited partner *612 shall either refuse the offer or give written notice of the offer to ML Partnership's general partner. Upon receipt of the written notice, the general partner then has thirty days to purchase the partnership interest covered by the offer under the terms and conditions of the offer. If the general partner does not elect to do so, the general partner must give written notice to the other Limited Partners, who then have thirty days to purchase the partnership interest covered by the offer under the terms and conditions of the offer. If neither the general partner nor any of the other limited partners exercise this option, the limited partner who originally received the offer then is free to sell the interest in ML Partnership covered by the offer.
In section 10.3 of the Partnership Agreement, the parties agree as follows:
Notwithstanding the foregoing provisions of Section 10.1, a [l]imited [p]artner may Transfer all or any part of the interest of such [l]imited [p]artner in the Partnership to: (a) the trustee of a trust created for the benefit of such [l]imited [p]artner or such [l]imited [p]artner's spouse, children or grandchildren; (b) any Wholly Owned Affiliate of such [l]imited [p]artner; (c) the guardian or legal representative of a [l]imited [p]artner as to whose estate a guardian or legal representative is appointed and to the executor or administrator of the estate of a deceased Limited Partner, or (d) to any other Person approved by all of the [p]artners (any such Transfer described above is referred to in this Agreement as a "Permitted Transfer"). To be a Permitted Transfer, in addition to meeting the other requirements in this Agreement, the Transfer must be in writing, the terms of which are not in contravention of any of the provisions of the Agreement, and the Transfer must be received by the [g]eneral [p]artner and recorded on the books of the Partnership.
In section 10.6 of the Partnership Agreement, the parties address purported transfers of interests in ML Partnership that are not Permitted Transfers:
Any purported Transfer by any Partner of an interest in the Partnership that is not a Permitted Transfer or a transfer permitted under Section 10.4 of this Agreement shall be null and void and of no effect whatever; provided that if the Partnership is required to recognize a Transfer that is not permitted (or if the Partnership, in its sole discretion, elects to recognize a Transfer that is not permitted), the interest transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy any debts, obligations or liabilities for damages that the transferor or transferee of such interests may have to the Partnership.
In section 10.10 of the Partnership Agreement, the parties agree as follows:
The Partnership will not be required to recognize the interest of any transferee who has obtained a purported transferred interest as the result of a Transfer that is not authorized by this Agreement and the Transfer shall be null and void for all purposes.
b. Effect of Alleged Failure to Comply with the Restrictions
On appeal, the Latif Parties argue that no trial evidence showed that the general partner gave its prior written consent to the 2010 purported assignments of Mokaram's limited partnership interests, as required by section 10.1 of the Partnership *613 Agreement. The Latif Parties also argue that no trial evidence showed compliance with section 10.2's right-of-first-refusal procedure or compliance with section 10.3's requirement that the Transfer be received by the general partner and recorded on the books of the Partnership for it to be a Permitted Transfer. We presume for the sake of argument that the Transfer did not satisfy these requirements of sections 10.1, 10.2, and 10.3.
The Latif Parties argue that under the Partnership Agreement, the failure to satisfy these requirements makes the purported transfer "null and void and of no effect whatever" under section 10.6, and therefore not subject to ratification, waiver, or confirmation. The provisions of Partnership Agreement do not lack clarity on this point, and we must enforce them as written. See David J. Sacks, P.C. , 266 S.W.3d at 450. Our role is not to question the wisdom of the parties' agreement or to rewrite its provisions under the guise of interpreting it. See Am. Mfrs. Mut. Ins. Co. , 124 S.W.3d at 162.
The plain, ordinary, and generally accepted meaning of the phrase "null and void and of no effect whatever" in a document is that the act to which the phrase refers is without any existence, power, or force. See Brazzel , 481 S.W.2d at 803. Under this meaning, a party cannot give life to a "null and void" attempted transfer by ratifying, confirming, or consenting to the attempted transfer or by purporting to waive its nullity. See Brazzel , 481 S.W.2d at 803 ; Harris , 134 S.W.3d at 427. But, the Partnership Agreement itself shows that the parties used the term "null and void and of no effect whatever" in a sense that differs from the plain, ordinary, and generally accepted meaning of the phrase. See Heritage Res., Inc., 939 S.W.2d at 121-22. Under the unambiguous language of section 10.6, the parties agreed that ML Partnership, in its sole discretion, may elect "to recognize a Transfer that is not permitted" and therefore was or would have been "null and void and of no effect whatever." In section 10.10 of the Partnership Agreement, the parties recite that the Partnership is not required to recognize the interest of any transferee who has obtained a purported transferred interest as the result of a Transfer that is "not authorized by this Agreement" and the Transfer shall be null and void for all purposes. This section does not conflict with the discretion of the Partnership under section 10.6 to recognize a Transfer that is not permitted; instead, this section states that if the Partnership does not exercise this discretion, the purported Transfer is null and void. Thus, under the Partnership Agreement, on or after the effective date of the Transfer, ML Partnership has the power to recognize a Transfer of a limited partnership interest as valid and effective, even though the Transfer does not satisfy the requirements identified by the Latif Parties on appeal. See id.
c. Separate Nature of the Partnership Agreement and the Company Agreement
Separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be construed together and considered as one instrument. Speedemissions, Inc. v. Bear Gate, L.P. , 404 S.W.3d 34, 45 (Tex. App.-Houston [1st Dist.] 2013, no pet.). Mokaram and Latif executed ML General's company agreement to govern ML General, the relations among members, managers, and officers, the assignment of membership interests, and other internal affairs of the limited liability company. Mokaram, Latif, and ML General executed the Partnership Agreement to govern ML Partnership, the relations between and among the limited *614 partners and the general partner, the transfer of limited partnership interests, and other internal affairs of the limited partnership. These two agreements do not reference each other, and each agreement is complete by itself. Because these agreements were not executed for the same purpose, they should not be construed together as one instrument. See Speedemissions, Inc. , 404 S.W.3d at 45 ; A.J. Robbins & Co. v. Roberts , 610 S.W.2d 854, 856-57 (Tex. Civ. App.-Amarillo 1980, writ ref'd n.r.e.) ; see also Lawrence v. U.S. , 378 F.2d 452, 461-62 (5th Cir. 1967). In any event, even if we construed the company agreement and the Partnership Agreement as a single contract, paragraph 10.6 would not apply to purported transfers of membership interests and would not allow ML General to recognize a transfer of a membership interest that otherwise would be void. Likewise, section 13.01 would govern only purported transfers of membership interests and would provide no exception to the void status of an attempted transfer of a membership interest in a manner not provided by the company-agreement provisions. Thus, under the unambiguous language of the respective agreements the parties allowed recognition of a void interest in one agreement, but did not allow this kind of recognition in the other agreement.
d. Potential Recognition of the 2010 Transfers of Interests in ML Partnership
In addition to signing each of the two 2010 assignments of limited partnership interest as assignor, Mokaram signed each on behalf of ML General, in his capacity as Manager, under the following legend: "CONSENTED TO BY THE GENERAL PARTNER OF [ML Partnership]." Paragraph 6.01 of ML General's company agreement provides that with exceptions not applicable in this context, "the Managers shall have the sole and exclusive control of the management, business and affairs of [ML General], and the Managers shall make all decisions and take all actions for [ML General] not otherwise provided for in [the company agreement]." Under the clear text of ML General's company agreement and under the Business Organizations Code, Mokaram's signature was binding on ML General, and thus ML General, as general partner of ML Partnership, consented to these two assignments as of the effective date of the transfers. See Tex. Bus. Orgs. Code Ann. § 101.254 (stating that (a) with exceptions not applicable in this context, "each governing person of a limited liability company ... vested with actual or apparent authority by the governing authority of the company is an agent of the company for purposes of carrying out the company's business" and (b) [a]n act committed by [such an agent] for the purpose of apparently carrying out the ordinary course of business of the company, including the execution of an instrument, document, mortgage, or conveyance in the name of the company, binds the company unless: (1) the agent does not have actual authority to act for the company; and (2) the person with whom the agent is dealing has knowledge of the agent's lack of actual authority"); ion index="67" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%20101.254">id. § 1.002(35A) (stating that, with exceptions not applicable in this context, "[g]overning authority" means a person or group of persons who are entitled to manage and direct the affairs of an entity under this code and the governing documents of the entity"); id. § 1.002(37) (stating that "[g]overning person" means a person serving as part of the governing authority of an entity"); Badmand Holdings, LLC v. Xie , No. 05-15-01379-CV, 2016 WL 6835722, at *3-4 (Tex. App.-Dallas Nov. 4, 2016, no pet.) (mem. op.). Thus, ML Partnership, acting through its *615 general partner, consented to these two assignments as of the effective date of the transfers. See Tex. Bus. Orgs. Code Ann. § 101.254 ; ion index="71" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%20101.254">id. § 1.002(35A); id. § 1.002(37); Badmand Holdings, LLC , 2016 WL 6835722, at *3-4.
In each of the two assignments to which ML Partnership consented Mokaram recited that "[a]ll requirements applicable to the transfer of the Interest have been satisfied or, if not satisfied, waived." Under the unambiguous language of the assignments and the company agreement and Partnership Agreement, as of October 29, 2010, ML Partnership recognized the transfer of limited partnership interest in each assignment as valid and effective. So, under the Partnership Agreement, each transfer was valid and effective on that date, even if the transfer did not satisfy the requirements identified by the Latif Parties on appeal.[17] See Heritage Res., Inc., 939 S.W.2d at 121-22. The trial evidence conclusively proved that Mokaram assigned his entire 49.5% limited partnership interest in ML Partnership to Choudhri effective October 29, 2010.[18] See Tex. Bus. Orgs. Code Ann. §§ 1.002(35A), 1.002(37), 101.254, Heritage Res., Inc., 939 S.W.2d at 121-22 ; Badmand Holdings, LLC , 2016 WL 6835722, at *3-4. The trial court did not err in declaring that "as of October 29, 2010, Choudhri has owned a total (not additional) 49.5% of [ML Partnership]."
2. The 2008 Agreement
Our resolution of the issues regarding the 2010 transfer of limited partnership interests does not dispose of the Latif Parties' challenge to the trial court's declaration that "since June 18, 2008, Choudhri has owned 15% [of] [ML Partnership]." In one of the 2008 agreements Mokaram purported to transfer, assign, sell, and convey to Choudhri a limited partnership interest in ML Partnership.[19] On appeal, the Latif Parties argue that no trial evidence showed that the general partner gave its prior written consent to this purported assignment, as required by section 10.1 of the Partnership Agreement. The Latif Parties also argue that no trial evidence showed compliance with section 10.2's right-of-first-refusal procedure or compliance with section 10.3's requirement that the transfer be received by the general partner and recorded on the books of the Partnership for it to be a Permitted *616 Transfer. The Latif Parties argue that under the Partnership Agreement, the failure to satisfy these requirements makes the purported transfer "null and void and of no effect whatever" under section 10.6 of the Partnership Agreement.
Unlike in the two 2010 assignments, no party signed this 2008 agreement on behalf of ML General. The trial evidence does not show conclusively that the general partner gave its prior written consent to the purported assignment of limited partnership interest in this agreement. Nor does the trial evidence conclusively prove that this purported transfer met the requirements for a Permitted Transfer under the Partnership Agreement. Thus, under the unambiguous wording of section 10.6 of the Partnership Agreement, the purported transfer in 2008 is null and void and of no effect whatsoever unless ML Partnership is required to recognize the transfer or ML Partnership exercises its sole discretion to recognize the transfer. The trial evidence does not conclusively prove that ML Partnership ever was required to recognize the transfer. Nor does the trial evidence conclusively prove that ML Partnership exercised its sole discretion to recognize the transfer under section 10.6 at any time before October 29, 2010. Even presuming for the sake of argument that ML Partnership recognized the 2008 transfer in the 2011 consent, this recognition did not purport to be retroactive, and, as discussed above, Mokaram already had assigned all of his limited partnership interest in ML Partnership on October 29, 2010. Thus, the trial evidence did not conclusively prove that Choudhri has owned any interest in ML Partnership since June 18, 2008, or since any date before October 29, 2010. The trial court erred in declaring that "since June 18, 2008, Choudhri has owned 15% [of] [ML Partnership]," and we sustain the part of the second issue in which the Latif Parties challenge this declaration. See Kehoe , 526 S.W.3d at 795-97.
As explained above, the trial court did not err in declaring that "as of October 29, 2010, Choudhri has owned a total (not additional) 49.5% of [ML Partnership]." Nor did the trial court err in declaring (1) from and after October 29, 2010, the only owner of an interest in ML Partnership other than Choudhri is Latif; (2) from and after October 29, 2010, Latif's ownership interest in ML Partnership is equal to that of Choudhri; and (3) the October 29, 2010 assignments of interest in ML Partnership are valid and enforceable. We overrule the part of the second issue in which the Latif Parties challenge these declarations.[20]
The Latif Parties assert that the trial court erred in declaring that "as of October 29, 2010, Choudhri has owned ... all beneficial rights and interests in [ML Partnership] that flow from [Choudhri's ownership of an interest in ML Partnership]." In their fourth issue, the Latif Parties assert that the trial court erred in refusing to clarify what ownership rights Choudhri has in ML Partnership. The two 2010 assignments recite that Choudhri "shall hereafter have and possess all beneficial rights and interests incident to the Interest." Under the unambiguous language of section 10.6 of the Partnership Agreement, the interests transferred to Choudhri are "strictly limited to [Mokaram's] rights to allocations and distributions as provided by this Agreement with respect to the transferred interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy *617 any debts, obligations or liabilities for damages that [Mokaram] or [Choudhri] may have to the [ML Partnership]." Under sections 10.2 and 10.6 of the Partnership Agreement neither of the 2010 assignments to Choudhri of a limited partnership interest gives Choudhri the right to become a limited partner in ML Partnership. Though the beneficial rights and interests incident to Choudhri's interest in ML Partnership are limited significantly under the Partnership Agreement, the trial court did not declare that Choudhri was a limited partner in ML Partnership, nor did the trial court inaccurately characterize these beneficial rights and interests. We conclude that the trial court did not err in making this declaration, and we overrule the parts of the second and fifth issues in which the Latif Parties challenge this declaration. We also conclude that the trial court did not err in refusing to clarify what ownership rights Choudhri has in ML Partnership, and we overrule the fourth issue.[21]
E. Should this court reverse the trial court's judgment as to attorney's fees?
In its judgment, the trial court awarded Choudhri trial and appellate attorney's fees against the Latif Parties jointly and severally. The only proper basis for the trial court to have awarded these fees is under the Texas Declaratory Judgments Act. See Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2015) (stating that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just"). On appeal, the Latif Parties assert various challenges to the attorney's-fees awards under their sixth issue, including challenges to the trial court's conduct of the bench trial regarding attorney's fees.
An award of attorney's fees under section 37.009 of the Declaratory Judgments Act falls within the discretion of the trial court and does not depend on a finding that a party substantially prevailed. Barshop v. Medina Cty. Underground Water Conservation Dist. , 925 S.W.2d 618, 637 (Tex. 1996). A trial court's award of reasonable and necessary attorney's fees under section 37.009 to a non-prevailing party does not amount in itself to an abuse of discretion and may be upheld on appeal if the trial court did not abuse its discretion in determining that this award is equitable and just in light of all the circumstances. See City of Houston v. Soriano , No. 14-05-00161-CV, 2006 WL 2506388, at *6 (Tex. App.-Houston [14th Dist.] Aug. 29, 2006, pet. denied) (mem. op.). Nonetheless, this court has determined that the trial court erred in making several declarations in favor of Choudhri, and we are reversing the trial court's judgment and remanding for rendition of a new judgment based on this court's disposition of the declaratory-judgment issues. Our disposition on appeal substantially affects the trial court's judgment and so warrants reversal of the trial court's attorney's-fees *618 awards, so that on remand the trial court can address what reasonable and necessary attorney's fees, if any, to award under the Declaratory Judgments Act in light of all the circumstances, including the relief to be granted in the trial court's judgment on remand. See Barshop , 925 S.W.2d at 637 ; Chase Home Fin., L.L.C. v. Cal West. Reconveyance Corp., 309 S.W.3d 619, 634 (Tex. App.-Houston [14th Dist.] 2010, no pet.). Therefore, we reverse and remand the trial court's judgment on all the attorney's-fees awards and issues without addressing the merits of any of the Latif Parties' challenges to the attorney's-fees awards under their sixth issue.
III. CONCLUSION
The trial court did not err in disregarding the jury's finding in response to Question 3. As to the declaratory relief, the trial court erred to the extent it declared that:
(1) "as of October 29, 2010, Choudhri has owned ... a total (not additional) 50% of [ML General], with all beneficial rights and interests in [ML General] that flow from such ownership, including Choudhri's status as a manager of [ML General] from and after October 10, 2010.";
(2) "[t]he only other owner of [an] interest in [ML General] from and after October 29, 2010 is [Latif], whose ownership interest in [ML General] is equal to that of Choudhri from and after October 29, 2010.";
(3) "[t]he October 29, 2010 assignments of interest in [ML General] from Mokaram to Choudhri and [Latif's] consent to any transfer of interest in [ML General] from Mokaram to Choudhri are valid and enforceable."; and
(4) "since June 18, 2008, Choudhri has owned 15% [of] [ML Partnership], and 15% of [ML General][.]"
We reverse the trial court's judgment to the extent the trial court made these four declarations. Because our disposition on appeal substantially affects the trial court's judgment, we reverse each of the trial court's attorney's-fees awards. We also reverse the trial court's taxation of court costs in favor of Choudhri.
We affirm the remainder of the trial court's judgment, including the following declarations:
(1) "as of October 29, 2010, Choudhri has owned a total (not additional) 49.5% of [ML Partnership] ... with all beneficial rights and interest in [ML Partnership] that flow from [Choudhri's ownership of this interest in ML Partnership]";
(2) "[t]he only other owner of [an] interest in [ML Partnership] from and after October 29, 2010 is [Latif], whose ownership interest in [ML Partnership] is equal to that of Choudhri from and after October 29, 2010.";[22] and *619 • (3) "[t]he October 29, 2010 assignments of interest in [ML Partnership] from Mokaram to Choudhri ... are valid and enforceable."[23]
We remand the entire case to the trial court with instructions to (1) determine what costs and reasonable and necessary attorney's fees, if any, should be awarded under the Declaratory Judgments Act in light of all the circumstances, including the relief to be granted in the trial court's judgment on remand; and (2) render a judgment, including declarations, in accordance with this court's opinion.
( Wise, J., dissenting).

To dispose of this appeal, we need not and do not decide the nature of ML Partnership's interest in the Beal Bank Building or the real property on which the building was constructed.

After the closing of this purchase, Latif borrowed against the Clarewood Property discussed below and split the proceeds with Mokaram, which repaid most, but not all, of Latif's share of the down payment. Mokaram testified that Latif eventually repaid the remainder of his share of the down payment.

In the document, the parties mistakenly recite that Mokaram owns a 30% interest in ML Partnership rather than the 49.5% interest that Mokaram actually owned.

Though ML General owns a 1% interest in ML Partnership, the parties often ignore this fact and speak as if an even split of the interests in ML Partnership would be a 50%/50% split rather than a 49.5%/49.5% split.

Merwin testified that the documents transferring 15% interests were intended as a means of "ratifying and confirming" the 2008 transaction in the event "there was any question or a dispute with respect to the initial documents."

As stated above, each actually would own a 49.5% interest in this scenario because ML General owns a 1% interest in ML Partnership.

To adjudicate this appeal, we need not address the details of the dispute regarding Choudhri's sister's medical group.

Mokaram also testified that the 2010 assignments of his interests in ML Partnership and ML General to Choudhri were contingent upon the purchase of Latif's interests in ML Partnership and ML General and that "[t]here would be no transaction if that didn't occur."

In the alternative, without language in Question 3 informing the jury that the trial court was asking the jury to determine whether Mokaram and Choudhri entered into an agreement to rescind the Four Assignments after the assignments had taken effect, the jury's finding in response to Question 3 was of no legal consequence because Question 3 did not submit a controlling issue. See Torrington Co. v. Stutzman , 46 S.W.3d 829, 838-41 (Tex. 2000) (concluding that general-negligence question did not submit a controlling issue and that the jury's finding in response to the question was of no legal consequence because the question lacked instructions concerning the factual predicates necessary for the defendant to have a negligence duty). Thus, the trial court should not have submitted Question 3, and the jury's finding in response to that question is immaterial. See ids="11093840" index="85" url="https://cite.case.law/sw3d/46/829/#p839">id. (holding that general-negligence question was immaterial rather than defective because the question did not submit a controlling issue due to the absence of instructions in the question regarding the factual predicates necessary for the defendant to have a negligence duty based on an undertaking theory of negligence).

We need not and do not address Choudhri's other grounds for disregarding the jury's finding in response to Question 3 or the Latif Parties' challenges to those grounds on appeal.

To dispose of this appeal, we need not and do not decide the nature of ML Partnership's interest in the land or the improvements located at 2500 West Loop South in Houston.

To dispose of this appeal, we need not and do not decide whether ML Partnership had any ownership interest in the Clarewood Property at the time of the 2008 transaction.

Page 4 of this opinion contains this handwritten description.

At trial Mokaram's testimony indicated that he was not disputing that he assigned a 15% interest in ML Partnership to Choudhri. Still, Mokaram's failure to dispute this assignment does not mean that the assignment was valid.

The company agreement defines "Transfer" to mean "any sale, transfer, encumbrance, gift, donation, assignment, pledge, hypothecation, or other form of transfer of a Membership Interest or any portion of a Membership Interest."

We have concluded above that Mokaram did not purport to assign, sell, and convey to Choudhri any interest in ML General in the 2008 transaction. Even if Mokaram had purported to assign, sell, or convey to Choudhri an interest in ML General in the 2008 transaction, that purported transfer would have been null and void ab initio under the company agreement based on an analysis substantially similar to the analysis in this subsection.

On appeal, the Latif Parties also assert that the trial evidence does not conclusively prove that Choudhri has owned a 49.5% limited partnership interest in ML Partnership since October 29, 2010, because the 2010 assignments purported to assign to Choudhri Mokaram's entire interest, yet the 2008 agreement purporting to transfer an interest in ML Partnership allegedly assigned a 15% interest to Choudhri. This argument incorrectly presumes that the trial evidence conclusively proved that the 2008 agreement was effective between its execution and October 29, 2010. In addition, even if Mokaram purported to assign Choudhri a 50% limited partnership interest when Mokaram owned only a 34.5% limited partnership interest, this fact itself would not mean that Mokaram did not convey his 34.5% limited partnership interest, although it might mean that Mokaram violated representations and warranties in the one of the 2010 assignments.

In one assignment, Mokaram says he is assigning a 15% limited partnership interest in ML Partnership, and in the other Mokaram says he is assigning a 35% limited partnership interest in ML Partnership. This transaction would result in a total assigned interest of 50%. But, Mokaram had only a 49.5% interest, and he could not assign a greater interest than he possessed. So, the assigned interest was 49.5% rather than 50%.

The agreement does not state clearly the amount of the transferred interest. Choudhri claims, and the trial court found, that it was a 15% interest, but the amount of the interest is not material to our analysis.

We need not determine whether Latif's consent in January 2011 to any transfers of interest in ML Partnership is valid and enforceable.

Though Mokaram sought declaratory relief in the trial court, Latif did not do so. In their prayer, the Latif Parties ask that we render judgment declaring that Choudhri did not acquire any interest in ML General or ML Partnership or, in the alternative, declaring that Choudhri did not acquire any interest in ML General or ML Partnership in 2010. In their appellants' brief, the Latif Parties have not provided any argument, analysis, citations to the record, or citations to legal authorities in support of this requested relief. Even construing the Latif Parties' appellate brief liberally, we cannot conclude that they have adequately briefed this issue. See San Saba Energy, L.P. v. Crawford , 171 S.W.3d 323, 337 (Tex. App.-Houston [14th Dist.] 2005, no pet.). Thus, we affirm the trial court's judgment that Mokaram take nothing on his declaratory-judgment claims.

Latif's ownership interest in ML Partnership is equal to that of Choudhri from and after October 29, 2010, in that Latif and Choudhri each own 49.5% of ML Partnership. This equality does not mean that Choudhri has the same rights as Latif. Instead, the interests in ML Partnership transferred to Choudhri are "strictly limited to [Mokaram's] rights to allocations and distributions as provided by this Agreement with respect to the transferred interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Partnership) to satisfy any debts, obligations or liabilities for damages that [Mokaram] or [Choudhri] may have to the [ML Partnership]." Choudhri's status as owner of these interests, by itself, does not give him the right to become a limited partner in ML Partnership. The jury was not asked to determine whether Choudhri is a limited partner in ML Partnership, and the trial evidence did not conclusively prove that proposition.

The trial court need not have addressed whether Latif's consent to any transfer of interest in ML Partnership from Mokaram to Choudhri is valid and enforceable.