**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

————————————

**NO. 09-22-00305-CV**

————————————

**IN THE INTEREST OF S.J. AND K.J.**

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 21-02-01611-CV

**MEMORANDUM OPINION**

After a jury trial, Appellant ("Appellant" or "Father") appeals the trial court's

order terminating his parental rights to his minor children S.J. ("Sam") and K.J.

("Kody"), three years old and one-and-a-half years old respectively at the time of

trial.[1,2] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2). In two issues,

---

[1] To protect the identity of the minor children, we use pseudonyms to refer to the children and family members. *See* Tex. R. App. P. 9.8(b)(2).

[2] During trial, Sam and Kody's mother ("Mother") signed an Affidavit of Voluntary Relinquishment of Parental Rights. The jury found that Mother had knowingly executed an irrevocable affidavit of relinquishment of her parental rights to the children and that termination of her parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K). Mother is not a party to this appeal, and we discuss her only as necessary.

1

Appellant argues that the trial court erred in admitting records that revealed the results of Father's drug testing and documents pertaining to his prior criminal convictions. We affirm.

## Background

The Department of Family and Protective Services ("the Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship on February 2, 2021, and an Affidavit in Support of Removal, signed by a Department representative. In the affidavit, the Department alleged that it had received a referral on January 13, 2021, with allegations of neglectful supervision of Kody (two months old) and Sam (one year old). According to the affidavit, Mother and Father had been arguing in front of the apartment while the children were left alone in the back of the apartment. It was reported to the Department that Father pushed Mother to the ground and put his foot on her neck and that the night before, Father had hit Mother. It was also reported that law enforcement had been called to the apartment multiple times, that Mother admitted to law enforcement that she smoked marijuana, and that when Mother was processed in jail, it was determined that she was under the influence of Xanax.

The affidavit stated that a Department representative was unable to contact anyone at the residence on January 14 or 15, and Mother called the Department

representative on January 19. The Department representative went to the home to speak with Mother and Father. Mother denied domestic violence, and Mother initially denied using Xanax, marijuana, and methamphetamine, but she later admitted to Xanax and marijuana use, and she admitted using methamphetamine two to three years earlier. Father denied domestic violence but admitted he and Mother had arguments and that there was sometimes "pushing and pulling" between them. Father also admitted smoking marijuana and stated that he and Mother had smoked marijuana that morning outside while the children were in the living room. The Department representative noticed a smell of marijuana inside the home.

According to the affidavit, Mother and Father agreed to have the children placed with the children's paternal grandmother. Both Mother and Father submitted to urinalysis and hair follicle drug testing. Mother tested positive for methamphetamine and marijuana, and Father tested positive for amphetamine, methamphetamine, and marijuana.

The affidavit also referenced Mother's and Father's prior history with CPS. In 2015, the Department received a report that Mother was smoking marijuana daily while caring for her then seven-month-old child "Ronnie." Mother's parental rights to Ronnie were later terminated, and Ronnie was adopted. In 2019, the Department received a report of domestic violence between Mother and Father while caring for Sam, who was then two months old. Mother reported being strangled, punched,

3

slapped, and Father told her he was going to kill her. Father was arrested. Both parents tested positive for marijuana. The parents were given outside resources. In 2020, the Department received another report of domestic violence between Mother and Father. Father indicated that Mother had punched him while he was holding Sam, and Father also punched Mother in the face. Mother tested positive for marijuana during that investigation. The parents were given outside resources, and the case was closed.

The affidavit also contained information about Mother's and Father's criminal history. Mother had been cited for a misdemeanor count of interfering with public duties in January 2021. Father had been convicted of manufacturing, delivering/selling/possessing a controlled substance in 2008, possession of a controlled substance in 2009, evading arrest or detention in 2016, and assault of a family member by impeding breathing or circulation in 2019. The Department asked to be named Temporary Managing Conservator of Sam and Kody.

Evidence at Trial

Testimony of Ashley Gonzales

Ashley Gonzales testified that she is currently a forensic interviewer with Children's Safe Harbor. Gonzales testified that she recognized Mother and Father from a welfare check she made in January 2021 while working as a patrol officer for the City of Conroe. When she arrived at the apartment complex, she observed

Mother and Father arguing. According to Gonzales, Mother made an accusation that a physical altercation had occurred with Father. Gonzales testified that Mother told her she had been smoking marijuana with a friend that day, and when she went home, she was upset, and she picked a fight with Father. When Gonzales entered the family's apartment, she saw Father with the two children, and she noticed the odor of marijuana. According to Gonzales, Father told her that Mother had "pull[ed] on him" but that there was no other physical altercation between them. Gonzales testified that she arrested Mother that day for interfering with public duties because Mother repeatedly walked away when Gonzales was attempting to talk to Mother. Gonzales said she did not know whether anyone was watching the children when Mother and Father were outside arguing.

Gonzales also testified that she encountered Mother and Father in August 2021 when she made a traffic stop. Gonzales recalled that she arrested Father that day for outstanding traffic warrants.

Testimony of the Court-Appointed Special Advocate

The Court-Appointed Special Advocate ("CASA") testified that he was assigned to this case in January 2021, and he remained assigned for the duration of the case. The CASA testified that he had observed the children in their foster home, where he thought the children were happy, they had a positive relationship with their caregivers, and they could not be doing better. The CASA had also observed some

5

visitations between the parents and the children, and he recalled there was a time when a child was "asked to time-out" but the CASA did not recall why. The CASA testified that he recommended termination of Mother's and Father's parental rights to the children based on the parents' behavior, including Mother's relapse. The CASA also testified that it was in the children's best interest for Mother's and Father's parental rights to the children to be terminated.

Testimony of Allison Adams

Allison Adams, a supervisor for the Department, testified that she was an investigator for this case. Adams recalled that she was asked to investigate neglectful supervision. Adams testified that after a couple of attempts, she made contact with the family. According to Adams, Mother told her she had been arrested for domestic violence, that she and Father did have a physical altercation, and Mother denied using drugs. Later Mother told Adams that Mother used Xanax and marijuana, but she denied using methamphetamines. Adams also testified that Father initially denied the allegations of domestic violence but admitted there had been "some type of push and pulling" between Mother and Father. According to Adams, Father denied using methamphetamines, but he admitted using marijuana, including using marijuana the same day Adams spoke with Father and when the children were inside the apartment and Mother and Father were outside. Adams recalled a strong smell of marijuana in the apartment. According to Adams, the children were initially

placed with their paternal grandmother and Mother and Father could visit with the children if the paternal grandmother or paternal aunt was present. Adams testified that the Department later learned that Mother was having unsupervised visits with the children and that at some point the children were not with the paternal grandmother, which was a violation of the safety plan, and the Department took steps to remove the children from the paternal grandmother due to concerns of Mother and Father using drugs, constant fighting between Mother and Father, and domestic violence.

Adams agreed that Mother and Father took drug tests as she requested. Adams testified that Mother tested positive for amphetamines, methamphetamines, and marijuana in January 2021. She testified that Father tested positive in January 2021 for amphetamines, methamphetamines, and marijuana on a hair follicle test and positive for marijuana on a urine test. Adams further testified that Mother tested positive for marijuana in July 2020, March 2021, and March 2022, and Mother tested positive for methamphetamine in March 2022. Adams agreed that she transferred off this case in February 2021, and she did not have personal knowledge of drug testing results after that date.

Adams testified that when she first contacted the family in January 2021, the children appeared to be in good condition, clean, appropriately dressed, and happy.

She also testified that a physical exam of the children did not show that the children had any medical issues.

Testimony of Officer Jeremy Raynor

Jeremy Raynor, an officer with the Conroe Police Department, testified that he responded to a disturbance at Mother's residence at about 2 a.m. in January 2022. That morning, Mother stated she was assaulted by Father. Raynor recalled that Mother said that Father may have been on some type of pills, he was acting aggressively, and the incident progressed into a physical altercation. Raynor testified that he observed marks on Mother's arms and elbow and that she had a bloody lip. Raynor also testified that Mother told him she was pushed against the wall, and there was a small hole in the wall. According to Raynor, both children were asleep in the apartment when he spoke with Mother, and Father was not there. Raynor also testified he was called to the home the week before trial on another disturbance call when a member of Father's family was trying to retrieve a PlayStation from the home.

Testimony of James Moore

James Moore testified that he was a CPS caseworker on the case from about October 2021 until the beginning of June 2022. According to Moore, when he came onto the case, Mother had completed about seventy-five percent of her services and Father "hadn't done anything" except one item on his service plan. Moore testified

that between October 2021 to January 2022, Father did not go for drug testing even though messages were left for Father to do so. Moore testified that the last time Father had taken a drug test was before Moore was assigned to the case. Moore also testified that at one point, Father stopped coming to visitations with the children, but when Father was released from jail, he resumed visitations. According to Moore, Mother and Father "did a great job[]" in their visitations with the children.

When Moore left the case in June 2022, he did not believe the children could safely be returned to the parents. Moore explained that the main concern at that time was Mother's positive drug test in March. According to Moore, Mother also skipped a couple of drug tests between March and June. Moore also testified that, as of June 2022, Father had only completed about twenty-five percent of his service plan. On cross-examination, Moore agreed that, when he was assigned to the case, he was not aware that Father had also completed the domestic violence education program and a substance abuse assessment required by Father's family service plan. According to Moore, Father inconsistently responded to his calls and texts, Father did not provide documentation of employment, and Father did not get stable housing of his own. Moore testified that the Department changed the goal from family reunification to unrelated adoption based on domestic violence and Mother's failed drug test. Moore also did not believe that Father was using the resources offered to him to overcome his issues. Moore believed that Father was bonded with the children and

9

had a good relationship with them, but the primary concerns with Father were his sobriety and accommodations and housing for the children and Father was not financially or emotionally able to be the primary caregiver for the children.

Testimony of Amber Hames

Amber Hames, a supervisor for CPS, testified that she had been assigned to this case since October 2021, and she was James Moore's supervisor. Hames stated that her concerns about Father were whether he could provide a safe and stable home for the children, his lack of compliance with the family services plan, his lack of sobriety and recent drug use, and his "continued aggression and violence" with Mother. According to Hames, the Department did not receive a report after Father's psychological assessment, Father did not complete individual counseling, Father did not complete the recommendations from his substance abuse assessment, and his employment was "on and off throughout the case." Hames explained that, when domestic violence is an issue, the Department's policy is that parents need to show they are learning how to change their behavior to avoid domestic violence, and she had not seen any such change from Father.

Hames agreed that it was in Sam's and Kody's best interest for Mother's and Father's parental rights to be terminated. Hames stated that the Department wanted Mother's and Father's parental rights to Sam and Kody to be terminated so the

10

children are no longer exposed to substance abuse and domestic violence and so they can be in a safe environment where they can grow and thrive.

Testimony of Foster Mother

The Foster Mother testified that Sam and Kody had been placed with her and her husband in February 2021. The foster parents have a seven-year-old son of their own with whom Sam and Kody play. She testified that Sam and Kody were hitting all their developmental milestones and they were "happy boys." The Foster Mother explained that she is a high school teacher, and the children go to a licensed day care not far from her school, including going to day care part time during the summer.

The Foster Mother and her husband are licensed as "foster to adoptive" and they are open to adoption in this case. She agreed that she would be willing to get therapy or other support for Sam and Kody to help them deal with any trauma caused by the process.

Mother's Testimony

Mother testified that she had three children—Sam, Kody, and another child to whom she relinquished her parental rights in a CPS case when she was sixteen years old. Mother also testified that she was pregnant at the time of trial, and it was "a possibility[]" that Father was the father of her unborn child. Mother agreed that she and Father started dating in 2018, and he moved in with her in 2019 because they had a son together and she wanted to "make it work[.]" When asked about fighting

11

between Mother and Father, Mother replied, "We have good days and bad days. [] I think the good days outweigh[] the bad." According to Mother, the incident in January occurred because Father was not supposed to be at the home "at an odd time[,]" she had asked Father to leave, and Mother called the police after she and Father started arguing. Mother testified that in the 2019 assault against her, she and Father were "tussling," and "he might have grabbed me on my face and my neck." According to Mother, in January 2022, she and Father were "tussling [and] wrestling[,]" and she hit her head on the wall.

Mother testified that she started using marijuana when she was about seventeen years old. She admitted that she had also used Xanax and methamphetamines. According to Mother, the last time she had used methamphetamines was three or four months before trial, and she knew she was pregnant at the time. Mother testified that she had been arrested twice, and one arrest was for interfering with police duties.

Mother testified that she completed all her services, including parenting, domestic violence, drug counseling, and "one-on-one group." Mother testified that she completed a drug test about two weeks before trial, but she "didn't receive any[]" calls to drug test before that. She further testified that at one point, she was unable to make her appointments with the substance abuse resource assigned to her because she was working full time.

Mother testified that she was on maternity leave at the time of trial, but before that, she was a manager at Big Lots where she made $13.87 an hour, and she intended to return to work after she had her baby. According to Mother, Father generally helps her pay her electric bill. Mother testified that she can provide the basic necessities for her children and she had identified a childcare facility for Sam and Kody.

Father's Testimony

Father testified that at the time of trial he had been working at a pizza restaurant for about two months, and he had provided the Department proof of his employment. Before working at the current pizza restaurant, he worked for a family friend at a moving service, at a different pizza restaurant, and at a fast food restaurant. He also testified that he was 39 years old, he first started using drugs when he was about 21 or 22 years old, he started with marijuana and alcohol, and he agreed that drugs had been part of his life since about 2009. When asked whether he had a drug issue or addiction, Father replied, "I mean, somewhat. I mean I think I can use, you know, a little help maybe[,]" but he had not sought help on his own. Father testified that he had also used methamphetamines and that he was charged with possession of cocaine in 2009. According to Father, in the past five years, he had used marijuana or methamphetamines about four times a month, and he had used methamphetamines about a month before trial.

Father testified that he was first arrested in 1999 or 2000. Father recalled that he was charged with possession of cocaine, but a 2008 Complaint, admitted as Exhibit 37, reflected a charge for possession of Alprazolam in trial cause 08-240501, which Father did not recall. Father acknowledged that Exhibit 41, which was admitted into evidence, is an Order of Adjudication of Guilt in trial cause 08-240501. Father agreed that his guilt was adjudicated in that matter because he failed to complete a drug offender education program. Father agreed he was charged for possession of marijuana in 2008 and that charge was dismissed because he was convicted in another case. Father identified Exhibit 31 as a charge for which he received deferred adjudication, and the exhibit appears to be a 2009 Indictment for possession of cocaine. According to Father, he ultimately was adjudicated guilty on that charge, too, and he was sentenced to three years but served about nine months. Father agreed he was convicted of evading arrest or detention in 2016, and he agreed Exhibit 30 reflects that he was not sentenced to any time on that charge. Father recalled that he was charged in 2020 for possession of marijuana the day before Kody was born, and he was convicted on that charge and sentenced to time served. Father agreed he was arrested and jailed in 2022 on a charge of "felon in possession of a firearm," but he stated he was not convicted. Father agreed that his urine drug test on April 21, 2021, showed he tested positive for amphetamines and methamphetamines, his urine drug test from June 9, 2021, showed he tested positive,

14

and his July 16, 2021, urine drug test showed he tested positive for amphetamines and methamphetamines.

Father testified that he met Mother in 2018 or 2019, they had been together about six years, and their relationship ended about a year and a half before trial. Father recalled that he and Mother lived in an apartment for about two years while they were together. According to Father, when he lived with Mother after Sam was born, they could provide food for the baby because Mother had a job. Father recalled a 2019 incident with Mother, and on that incident, he was convicted of domestic violence. According to Father, he and Mother "tussle[d]" but he did not hit her or jump on her. Exhibit 21 is an Information reflecting a charge against Father for assault of Mother in July 2019 and Exhibit 24 is a Judgment of Conviction on a charge of assault causing bodily injury, reflecting that Father pleaded guilty and was sentenced to 100 days in jail. Father recalled that he moved in with Mother about two months after the incident. According to Father, the same day he was charged with "felon in possession of a firearm," he was also charged with domestic violence against Mother, and he pleaded guilty to the domestic violence charge. Father agreed that the children were present at the time of the domestic violence, but he could not recall what he and Mother argued about that day. According to Father, he and Mother had "a lot of arguments[]" that included yelling but were "more verbal than physical[.]" Father testified that even though he pleaded guilty to assaulting Mother,

15

he had not assaulted her, and it was easier and less stressful to take a plea bargain than to go to trial.

Father testified that he took parenting classes. According to Father, both children were bonded with him. Father testified that he had provided written documentation to the Department that he was living with his mother and giving his mother money monthly. Father also testified that he had completed a substance abuse assessment, that he completed individual and group sessions afterwards, and that he had "slowed down a lot" on his drug use since the sessions began, but he admitted he was "still using[]" drugs. He also testified that he had completed a domestic violence assessment and he completed group sessions on domestic violence. Father testified that he also completed a psychological evaluation for coping skills and mental health. According to Father, he was never sent for any counseling other than for substance abuse and domestic violence. Father recalled that over the course of the case, he missed "[m]aybe three[]" visits with his children. According to Father, in the seven months before trial, he had not received a call instructing him to take a drug test. Father testified that he had had "[m]aybe four[]" telephone numbers during the case. Father agreed that the evidence suggests that he had not completely stopped using drugs. When asked what his plan was for his children, Father responded that he preferred for Mother to have primary custody of the children, and he would help Mother take care of the children.

Father's attorney notified the trial court on the second day of the trial that he spoke with Father earlier that day but could not find Father when the trial began. The record indicates that Father was not present for the second day of trial. The record does not provide any information about the reason for his absence. On the second day of trial, Mother signed an affidavit voluntarily relinquishing her parental rights to both Sam and Kody. The affidavit was filed with the trial court, and the jury was advised that the parties had reached a stipulation that Mother had signed a voluntary relinquishment of her parental rights. The trial court accepted the stipulation. The Department asked the jury to terminate Mother's parental rights based on section 161.001(b)(1)(K) of the Family Code and based on the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K) (providing for involuntary termination of parental rights where the parent "executed before or after the suit is filed an unrevoked or irrevocable affidavit of relinquishment of parental rights").

After deliberations, the jury found by clear and convincing evidence that: Mother knowingly executed an irrevocable affidavit of relinquishment of her parental rights to the children; that termination of Mother's parental rights was in the children's best interest; that Father knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger their physical or emotional well-being; that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or

17

emotional well-being; that Father failed to comply with his court-ordered family services plan; and that termination of Father's parental rights was in the children's best interest. The trial court accepted the jury's verdict and signed a Final Order Terminating Parental Rights of Mother and Father as to both Sam and Kody. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (K), (O), (2).

## Issues

In two issues, Father argues that the trial court erred in admitting certain evidence.[3] In his first issue, Father argues that the trial court erred in admitting documents containing drug testing results as a business record because "[t]he evidence presented within the drug testing affidavit indicates a lack of trustworthiness of the test results[.]" Father argues that the drug tests were not actually conducted by the entities that provided the records, the custodian could not testify the tests were standard for the field, there was no evidence to show the sponsoring witness had personal knowledge of how the tests were conducted, and there was an insufficient chain of custody to show that the tests were actually of Father's hair or urine.

---

[3] Father does not challenge whether the evidence was sufficient to support the statutory predicate grounds for termination of his parental rights nor whether termination of his parental rights was in the children's best interest. His only challenge is to the admission of evidence.

In his second issue, Father argues that the trial court erred by admitting evidence of Father's prior criminal convictions because their probative value was substantially outweighed by their prejudicial effect. Father also argues that evidence of Father's convictions in 2008, 2009, and 2016 were not relevant because they predated the birth of Sam and Kody. Although Father concedes that "incidents of repeated arrests and convictions of drug possession charges would be relevant to [the] best interest in a parental termination trial[,]" in this case, he contends because the convictions occurred thirteen to fourteen years before the termination trial the convictions should not have been admitted into evidence. According to Father, Texas Rule of Evidence 609 generally limits the admission of evidence of prior convictions to those within the past ten years unless the probative value substantially outweighs any prejudicial effect. *See* Tex. R. Evid. 609(b). Father also argues that a dismissed trespass charge and a misdemeanor evading arrest conviction from five years before trial "offer no insight into Appellant's ability to appropriately care for his children[]" and that the evidence of criminal acts that occurred thirteen to fourteen years earlier was more prejudicial than probative.

Standard of Review

We review a trial court's decision to admit evidence for an abuse of discretion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015); *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court

abuses its discretion when it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We will uphold the trial court's decision if it is within the zone of reasonable disagreement. *Diamond Offshore Servs., Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018).

We will not reverse a trial court's judgment based on the erroneous admission of evidence unless we conclude that the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). In determining whether the erroneous admission of evidence was harmful, we review the entire record. *Interstate Northborough*, 66 S.W.3d at 220. "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Id.* The erroneous admission of evidence is harmless if the evidence is merely cumulative of other evidence admitted at trial. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

The Drug Testing Records

When the Department offered the drug testing results into evidence, Father's attorney objected based on a "lack of authentication and trustworthiness" of the

records and because he argued the affidavit or business records did not meet the requirements of the rules. Appellant's brief does not specifically identify which exhibits he is challenging, but at trial Father objected to Exhibits 43, 44, and 45. Exhibits 43 and 44 contain drug testing results for Mother for dates between July 27, 2020 and March 4, 2022. Exhibit 45 contains drug testing results for Father for dates between September 25, 2020 and July 15, 2021.

Rule 902(10) of the Texas Rules of Evidence provides that certain business records accompanied by an affidavit as outlined in the rules are self-authenticating. The original or a copy of a record that meets the requirements of Rule 803(6) or (7) when accompanied by an affidavit that complies with subparagraph (B) of Rule 902(10) and that is served in accordance with subparagraph (A) of Rule 902(10) is self-authenticated. *See* Tex. R. Evid. 902(10). Rule 803(6) provides a hearsay exception for business records if:

> (A) the record was made at or near the time by - or from information transmitted by - someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted business activity;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by an affidavit or unsworn declaration that complies with Rule 902(10); and

21

(E) the opponent fails to demonstrate that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

"Business" as used in this paragraph includes every kind of regular organized activity whether conducted for profit or not.

Tex. R. Evid. 803(6). Under Rule 803(6), records from a business may include records created by that business and in some instances records from a third party that are incorporated into the records of the other business if: (1) the document is incorporated and kept in the course of the testifying witness's business, (2) that business typically relies upon the accuracy of the document's content, and (3) the circumstances otherwise indicate the document's trustworthiness. *See In re O.G.H.D.*, No. 09-21-00172-CV, 2021 Tex. App. LEXIS 8002, at **20-21 (Tex. App.—Beaumont Sept. 30, 2021, no pet.) (mem. op.); *In re J.N.P.*, No. 09-20-00245-CV, 2021 Tex. App. LEXIS 1827, at **20-21 (Tex. App.—Beaumont Mar. 11, 2021, no pet.) (mem. op.) (collecting cases from the Courts of Appeal addressing the admissibility of third-party documents as business records of a different business).[4] A document is considered authentic if it meets the requirements of self-

---

[4] Under Rule 902(10)(B), the rule provides that the form of the affidavit is sufficient if the proponent states the following:

1. I am the custodian of records [*or* I am an employee or owner] of _____ and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.
2. Attached are _____ pages of records. These are the original records or exact duplicates of the original records.

22

authentication as set forth in Rule 902. Rule 902(10)(B) includes language noting the sample form is "not exclusive." Tex. R. Evid. 902(10)(B).

Appellant argues that "[t]here are several issues with the affidavit attached to Appellant's drug testing results[,]" specifically that the drug tests were not actually conducted by the entities that provided the records, the custodian could not testify the tests were standard for the field or that they had personal knowledge of the tests and results, and there was an insufficient chain of custody to show the tests were actually of samples provided by Appellant. Appellant concedes that the sponsoring witness does not have to be the record's creator or have personal knowledge of the contents of the record.

---

3. The records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth. [*or* It is the regular practice of _____ to make this type of record at or near the time of each act, event, condition, opinion, or diagnosis set forth in the record.]
4. The records were made by, or from information transmitted by, persons with knowledge of the matters set forth. [*or* It is the regular practice of _____ for this type of record to be made by, or from information transmitted by, persons with knowledge of the matters set forth in them.]
5. The records were kept in the course of regularly conducted business activity. [*or* It is the regular practice of _____ to keep this type of record in the course of regularly conducted business activity.]
6. It is the regular practice of the business activity to make the records.

Tex. R. Evid. 902(10)(B).

23

In this case, each report of drug testing included a business records affidavit.[5] The business records affidavits state that the drug tests "utilize[ed] strict chain of custody procedures" and were "performed utilizing GC/MS (gas chromatography/mass spectrometry) instruments by a certified scientist and reviewed by a licensed Medical Review Officer." The affidavits further state that a record of the test result was kept in the regular course of business of the Texas Alcohol and Drug Testing Service and that it is in the regular course of business of that entity for an employee or representative with knowledge of the act, event, condition, opinion, or diagnosis to record the information at or reasonably near the

---

[5] The affidavits state in relevant part:

I am the custodian of records of Texas Alcohol & Drug Testing Service, Inc., located at 411 Lantern Bend Drive, Ste 210, Houston, Texas 77090. Attached hereto are [] pages of records from Texas Alcohol & Drug Testing Service, Inc. regarding hair/nail/oral fluid/urine standard testing utilizing strict chain of custody procedures, analyzed by GC/MS (gas chromatography/mass spectrometry) instruments administered by a Certified Scientist and reviewed by a licensed Medical Review Officer. These said [] pages of records are kept in the regular course of business by the laboratory and medical review office, which are obtained and kept by Texas Alcohol & Drug Testing Service, Inc., in the regular course of business, and it was the regular course of business of Texas Alcohol & Drug Testing Service, Inc. for an employee or representative of Texas Alcohol & Drug Testing Service, Inc., with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

24

time it occurred. We conclude that the affidavits accompanying the drug testing results comply with the requirements of Rule 902(10)(B). *See* Tex. R. Evid. 902(10)(B); *In re O.G.H.D.*, 2021 Tex. App. LEXIS 8002, at **21-22. Therefore, the only question regarding their admissibility was whether the drug test reports showed sufficient indicia of trustworthiness to bring them within the business-records exception to the hearsay rule. *See In re O.G.H.D.*, 2021 Tex. App. LEXIS 8002, at **21-22.

The drug test results themselves are signed by a "Certified Medical Review Officer"—an M.D. The test results identify the collection site, date, type of panel test used, and name of the lab that performed the test. Attached to the business-records affidavits are (a) the laboratory reports indicating the quantitative results, identifying the lab as "DHHS Certified," and (b) the "Forensic Drug Testing Custody and Control Form" that accompanied the sample each parent provided as it was transported from the testing facility to the laboratory. We have previously concluded that a trial court does not abuse its discretion in determining that business records affidavits and drug testing results reports like these show sufficient indicia of trustworthiness to be properly admitted as a business record. *See id.* at **21-23. We conclude that the trial court in this case did not abuse its discretion in admitting the drug testing results with the accompanying business records affidavit. *See id.*; *see also In re J.N.P.*, 2021 Tex. App. LEXIS 1827, at **20-26.

Further, here substantially the same evidence was admitted elsewhere in the record without objection, when Father admitted that his urine drug test on April 21, 2021, showed he tested positive for amphetamines and methamphetamines, he admitted his urine drug test from June 9, 2021, showed he tested positive, and he admitted his urine drug test dated July 16, 2021, showed he tested positive for amphetamines and methamphetamines. CPS supervisor Allison Adams also testified that Mother and Father had positive drug test results in 2021. Accordingly, any error in admitting the testing documents would be harmless error. *See In re O.G.H.D.*, 2021 Tex. App. LEXIS 8002, at *23. In addition, Father agreed at trial that the evidence suggested that he had not completely stopped using drugs. Therefore, even assuming the trial court erred in admitting the drug test reports, we conclude any such error was harmless. *See id.* at **23-24. We overrule Appellant's first issue.

Appellant's Criminal Records

At trial, Father objected to the admission of Exhibits 25 through 42, which contain records of criminal charges or convictions from 2008, 2009, and 2016. Father argued that these records predate the birth of his children and were "very old and unfairly prejudicial[.]" These objections appear to pertain to evidentiary Rules 401 and 403. *See* Tex. R. Evid. 401 and 403.

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re T.B.*, No. 09-20-00172-CV, 2020 Tex.

App. LEXIS 8938, at **32-33 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (citing *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (parent's past performance as parent is relevant to determination of present and future ability to provide for child)). Where, as here, the Department seeks termination of parental rights based on endangerment, evidence of endangerment is not limited to actions directed toward the child and may include the parent's actions before the child's birth and the time when the parent had custody of older children. *In re T.J.*, No. 09-22-00224-CV, 2022 Tex. App. LEXIS 8963, at *8 (Tex. App.—Beaumont Dec. 8, 2022, no pet. h.) (mem. op.) (citing *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009)). A parent's drug use, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent engaged in conduct that endangered the child's emotional and physical wellbeing. *See In re L.B.*, No. 09-21-00224-CV, 2022 Tex. App. LEXIS 345, at *20 (Tex. App.—Beaumont Jan. 20, 2022, no pet. h.) (citing *In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.)). In addition, a parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re T.B.*, 2020 Tex. App. LEXIS 8938, at **32-33; *In re B.C.H.*, No. 09-18-00437-CV, 2019 Tex. App. LEXIS 3546, at *33 (Tex. App.—Beaumont May 2, 2019, no pet.) (mem. op.) (citing *In re B.R.*, 561 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.)).

27

Specific danger to a child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the child. *See In re T.B.*, 2020 Tex. App. LEXIS 8938, at *25.

Rule 403 favors the admission of relevant evidence, and we presume that relevant evidence is more probative than prejudicial. *See Towery v. Realty Partners, Inc.*, No. 09-20-00054-CV, 2022 Tex. App. LEXIS 1783, at **30-31 (Tex. App.—Beaumont Mar. 17, 2022, no pet.) (mem. op.). The mere age of convictions does not render them more prejudicial than probative. *See Murray v. Tex. Dep't of Family & Protective Servs.*, 294 S.W.3d 360, 370 (Tex. App.—Austin 2009, no pet.) (citing *Taylor v. Tex. Dep't of Family & Protective Servs.*, 160 S.W.3d 641, 653 (Tex. App.—Austin 2005, pet. denied)). A history of recidivism or evidence of a conviction before a child's birth may indicate a parent's inability to provide a stable environment for a child. *See In re R.C.S.*, No. 09-08-00355-CV, 2009 Tex. App. LEXIS 714, at *6 (Tex. App.—Beaumont Feb. 5, 2009, no pet.) (mem. op.). It is the trial court's function as factfinder to decide how much weight to give to the evidence of a parent's historical pattern of conduct. *See In re L.P.*, No. 09-19-00421-CV, 2020 Tex. App. LEXIS 9396, at **24-25 (Tex. App.—Beaumont Dec. 3, 2020, pet. denied) (mem. op.).

The records Appellant challenges in his second issue include:

- a 2016 charge for entering a residence without consent that was dismissed because Father was convicted in another case;

- a 2016 charge for evading arrest or detention to which Father pleaded guilty;
- a 2009 charge for possession of cocaine, to which Father pleaded guilty and for which he was sentenced to three years' imprisonment;
- a 2008 charge for possession of marijuana that was dismissed because Father was convicted in another case; and
- a 2008 charge for possession of Alprazolam (a controlled substance), to which Father pleaded guilty, for which he received a deferred sentence but was adjudicated guilty and sentenced to a fine and 90 days in jail.

Father argues that admission of evidence of the older criminal acts is not relevant to his ability to care for his children. We disagree. Father's criminal history—even before the birth of Sam and Kody—had probative value regarding Father's ability to care for his children, the endangerment of the children, and to the children's best interest. *See In re T.J.*, 2022 Tex. App. LEXIS 8963, at \*8; *In re T.B.*, 2020 Tex. App. LEXIS 8938, at \*\*32-33; *In re B.C.H.*, 2019 Tex. App. LEXIS 3546, at \*33. Appellant argues that under Rule of Evidence 609, impeachment by evidence of a criminal conviction is limited to evidence within the past ten years. *See* Tex. R. Evid. 609. But the Department did not offer the objected-to criminal records to impeach Father, but rather to show a "continued pattern of behavior [] ongoing from 2008 to where we are today." Rule 609 does not apply.

With respect to the complaint that the records were "unfairly prejudicial," given the highly probative nature of the evidence in establishing a pattern of behavior of the Father in engaging in criminal behavior and illicit drug use, and the other testimony already before the fact finder, and the nature of the best interest

29

determination that the trial court as the fact finder had to decide, the trial court could have reasonably determined that any danger of unfair prejudice to Appellant did not substantially outweigh the probative value of the records.[6] *See* Tex. R. Evid. 403. We conclude that the trial court did not err in admitting the records.

We also note that even though Father objected to the admission of these records, he testified without objection about his criminal history, including that he was first arrested in 1999 or 2000, that he was charged in 2008 and 2009 with possession of a controlled substance, and that he was convicted of evading arrest or detention in 2016. As already explained, even assuming the trial court erred in admitting the complained-of exhibits, it was merely cumulative of other evidence, so its admission did not harm Father in the trial. *See Armstrong*, 145 S.W.3d at 144. We overrule Appellant's second issue.

---

[6] We have previously explained,

> [b]ecause the best interest of the child must always be the primary consideration in a parental-rights termination case, evidence relevant to the best interest of the child will seldom be excluded under Rule 403. *See In re B.C.*, No. 02-15-00175-CV, 2015 Tex. App. LEXIS 10639, at *3 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op.) (citing *Garza v. Garza*, 217 S.W.3d 538, 555 (Tex. App.—San Antonio 2006, no pet.) (exclusion of evidence under Rule 403 is an extraordinary remedy to be used sparingly in a parental-rights termination case); *In re J.W.*, 113 S.W.3d 605, 612 (Tex. App.—Dallas 2003, pet. denied); *In re C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex. App.—Waco 2000, pet. denied)).

*See In re A.M.*, No. 09-19-00075-CV, 2019 Tex. App. LEXIS 7941, at **41-42 (Tex. App.—Beaumont Aug. 29, 2019, pet. denied) (mem. op.).

Having overruled both of Appellant's issues, we affirm the trial court's order of termination.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on December 27, 2022
Opinion Delivered January 26, 2023

Before Horton, Johnson and Wright, JJ.