2026 Tex. Bus. 4



THE BUSINESS COURT OF TEXAS
EIGHTH DIVISION

| | | |
|---|---|---|
| MICHAEL D. CRAIN, Individually and Derivatively on Behalf of NORTHERN CRAIN REALTY, LLC, NORTHERN CRAIN PROPERTY MANAGEMENT, LLC, and NORTHERN CRAIN, LLC<br><br>*Plaintiff,*<br><br>v.<br><br>WILLIAM "WILL" NORTHERN.<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 25-BC08A-0014 |

---

## AMENDED OPINION AND ORDER

---

### *Syllabus**

> This Opinion addresses the enforcement of a mandatory Buy-Sell Option clause and its specific performance remedy after the Offeror tendered the requisite buy/sell notice and the Offeree failed to respond to the notice and claimed the Offeror violated the underlying Company Agreement. The Court ultimately finds the Offeror is entitled to specific performance from the Offeree under the Buy-Sell Option clause. The Court awards the Offeror attorneys' fees.

---

> * The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

**OPINION**

¶ 1    Pending before the Court is Defendant William Northern ("Northern")'s Motion for Summary Judgment for Specific Performance of Buy-Sell Purchase ("Motion"), filed on October 23, 2025.  Plaintiff Michael D. Crain ("Crain") filed his Response to Defendant's Motion for Summary Judgment for Specific Performance of Buy-Sell Purchase ("Response") on November 27, 2025, and Northern filed his Reply on December 3, 2025. The Court held a hearing on the Motion on December 3, 2025.  Northern timely objected and moved to strike the Declaration of Garette M. Amis attached to Crain's Response as summary judgment evidence.[1]  The matter is ripe for review.

## I.    BACKGROUND

¶ 2    Crain and Northern shared a business relationship.  In 2020, the two created Northern Crain Realty, LLC ("Realty") and Realty's two subsidiaries, Northern Crain Property Management, LLC ("Property Management") and Northern Crain, LLC ("NC, LLC") (individually, "NC Entity," and collective with Realty, the "NC Entities").  *See* Plaintiff's Second Amended Petition ("Sec. Am. Pet.") at 4; *see* Northern's Motion for Summary Judgment ("SJ Mot.") at 3.  Crain and Northern each hold 50% membership interest in the NC Entities.  *See* SJ Mot. at 5.  Each entity is governed by nearly identical Company Agreements (collectively hereinafter, the "Company Agreements").  *See id.* at 3.

---

[1] Crain filed the "Declaration of Garette M. Amis" ("Amis Declaration") as a Response exhibit.  *See* Plaintiff's Response to Defendant's Motion for Summary Judgment for Specific Performance of Buy-Sell Purchase ("Resp."), Ex. A, at 26-28.  Amis, as counsel for Crain and the NC Entities, claims to have "personal knowledge of the facts stated herein regarding the information relating to [Crain's] Response."  *Id.* at 28. However, for the reasons stated in the Order issued January 29, 2026, the Court will not consider the Amis Declaration, as it does not comport with Texas Rule of Civil Procedure 166a(f) and lacks any probative value.

Crain and Northern each signed the Company Agreements.[2] *See id* at 3. Section 10.08 of each Company Agreement is the "Buy-Sell Option" clause that provides for a mandatory buy-sell procedure should Crain or Northern seek to sell or buy membership interest in an entity.[3] *See* SJ Mot., Ex. A at 49-50.

¶ 3     In June 2025, Crain sued Northern claiming, *inter alia*, Northern breached fiduciary duties by acquiring the Woodhaven Country Club and adjacent property ("Woodhaven Project"). *See* Sec. Am. Pet. at 14. Northern counterclaimed for specific performance and a declaratory judgment, seeking the following relief:

> (1) A judgment of specific performance against Crain and ordering Crain to execute and deliver to Northern the assignment of his membership interests in the NC Entities, (2) a declaration that the purported attempt to expel Northern from the NC entities was invalid, void, and of no force and effect, (3) a declaration that the Woodhaven Project is neither directly competitive with the defined business activity of the NC Entities nor a violation of Section 13.03 of the Company Agreements, and (4) attorneys' fees.

*See* Defendant's Original Counterclaim for Specific Performance and Declaratory Judgment at 17-18.

¶ 4     Northern filed the instant Motion seeking an order of specific performance requiring Crain to sign and deliver to him an "Irrevocable Assignment of Membership Interest" for each NC Entity with an effective date of December 19, 2024. *See* Motion at

---

[2] NC, LLC's Company Agreement on November 30, 2020, Realty's Amended and Restated Company Agreement on October 22, 2020, and Property Management's Amended and Restated Company Agreement also on October 22, 2020.

[3] Provisions such as Section 10.08 are commonly referred to as "Texas Shootout" provisions. *See Wings v. Freedman,* No. 05-23-00077-CV, 2024 WL 5066085, at *1, n.2 (Tex. App.—Dallas Dec. 11, 2024, no pet.), *citing* Douglas G. Baird and Donald S. Bernstein, *Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain,* 115 Yale Law Journal, 1930, 1953 (2006).

25. Northern argues Crain, as a matter of law, breached the Company Agreements' Buy-Sell Option clause and is obligated to sell his membership interests in the NC Entities to Northern. *See* SJ Mot. at 2. But Crain contends genuine issues of material fact exist concerning (1) Northern's alleged prior breaches that preclude him from enforcing the Company Agreements' Buy-Sell Option clause, (2) Northern's alleged unclean hands, and (2) Northern's valuation of the membership interests' absent the Woodhaven Project's potential profit. *See* Resp. at 5, 13, 21.

## II. LEGAL STANDARD

¶ 5 Summary judgment is governed by Texas Rule of Civil Procedure 166a. To obtain a traditional summary judgment, the movant "bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (*citing* TEX. R. CIV. P. 166a(c)). For a traditional motion for summary judgment, the movant satisfies its burden by conclusively negating at least one element of the nonmovant's cause of action or proving all elements of the movant's cause of action or affirmative defense. *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016). The burden then shifts to the nonmovant to raise a fact issue to defeat summary judgment. *Id.* at 97. This burden requires the nonmovant to specifically identify the supporting proof it seeks to have considered by the trial court and explain why it demonstrates a fact issue exists. *Cty. of Hous. v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979); *see also Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 379 (Tex. App.—Texarkana 1989, no writ).

¶ 6    A summary judgment response that relies on conclusory assertions, broad record references, and fails to pinpoint evidence tying particular facts to particular defenses is not sufficient. *See Nguyen v. Allstate Ins. Co.*, 404 S.W.3d 770, 776-77 (Tex. App.—Dallas 2013, pet. denied) (general reference to voluminous exhibits and other supposed "evidence" without more explicit direction to the support for a claim will not raise an issue of fact). The Court need not sift through the voluminous exhibits offered to supply the missing linkage. *See id.; see also Comm'n for Lawyer Discipline v. Powell,* 689 S.W.3d 620, 629 (Tex. App.—Dallas 2024, no pet.)("Merely citing generally to voluminous summary judgment evidence in response to either a no-evidence or traditional motion for summary judgment is not sufficient to raise an issue of fact to defeat summary judgment."); *Aguilar v. Morales*, 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied) ("In the absence of any guidance from the non-movant where the evidence can be found, the trial and appellate courts are not required to sift through voluminous [evidence] in search of evidence to support the non-movant's argument that a fact issue exists."). Further, what is effectively an attorney's verification without any credible foundation for personal knowledge does not create a genuine fact issue. *See Stucki v. Noble*, 963 S.W.2d 776, 781-82 (Tex. App.—San Antonio 1998, pet. denied), *citing Tubin v. Garcia*, 159 Tex. 58, 62, 316 S.W.2d 396 (Tex. 1958) (counsel's affidavits stating check copies were "true and correct" is not competent summary-judgment evidence absent a foundation for counsel's personal knowledge).

¶ 7    When evaluating a motion for summary judgment based on summary-judgment evidence, the Court must take as true all evidence favorable to the nonmovant,

indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex. 2004). Questions of law are appropriate matters for summary judgment. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 178 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g).

## III.   DISCUSSION

### A.   The Company Agreements and the Buy-Sell Option Clause

#### 1.   Validity and Plain Language

¶ 8   As a matter of law, the Company Agreements, including the Buy-Sell Option clauses contained therein, are valid agreements governing the NC Entities and their express terms must be enforced.  Akin to a contract, a company agreement governs the internal affairs of a limited liability company.  TEX. BUS. ORGS. CODE § 101.052(a).  The agreement may contain any provision for the regulation and management of the company's affairs that is not inconsistent with the law.  *Id.* § 101.052(d).  When interpreting a company agreement, courts apply the general principles of contract construction.  *See Abdullatif v. Choudhri*, 561 S.W.3d 590, 609-10 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

¶ 9   A court's primary objective when construing a contract is "to ascertain and give effect to the parties' intent as expressed in the instrument."  *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (*quoting URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018)).  Thus, when the provisions of a company agreement are unambiguous, a court must enforce them as written and take care not to rewrite them under the guise of interpretation.  *Abdullatif*, 561 S.W.3d at 609-10 (*citing Am. Mfrs. Mut. Ins.*

*Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003). A court will determine and enforce the parties' intent as it was expressed within the four corners of the written agreement, interpreting the contractual language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise. *Piranha Partners v. Neuhoff*, 569 S.W.3d 740, 743 (Tex. 2020); *URI*, 543 S.W.3d at 763-64. A court will examine the entire agreement and give every provision effect so none will be meaningless, as courts cannot interpret around clearly defined terms or phrases. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126; *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 & n.15 (Tex. 2021) (per curiam).

¶ 10    Options, preferential rights, and contractual buy-sell mechanisms are unilateral rights that must be exercised or timely challenged in the manner the agreement prescribes, and courts generally enforce deemed-election clauses as written. *See, e.g., L&S Pro-Line, LLC v. Gagliano*, No. 09-21-00178-CV, 2024 WL 3218507, at *16-18 (Tex. App.—Beaumont June 28, 2024, pet. denied) (enforcing push-pull clause where member made no election during the election period); *Wings v. Freedman*, No. 05-23-00077-CV, 2024 WL 5066085, at *5-6 (Tex. App.—Dallas Dec. 11, 2024, no pet.) (enforcing deemed-election consequence and rejecting post-deadline procedural and methodology challenges). Relatedly, when a contract makes the timing and manner of acceptance essential, a party cannot let the acceptance window close and then avoid the consequences of its inaction. *See Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 523-24 (Tex. App.—Amarillo 1998, pet. denied) (option must be accepted "in the precise manner required").

Here, the Company Agreements' Buy-Sell Option clause reads:

> **10.08 Buy-Sell Option**. Each Member shall have, and is hereby granted, the right to initiate a mandatory buy-sell option by providing written notice (the "Buy-Sell Notice") to any other Member, which Buy-Sell Notice shall set forth the offering Member's offer to purchase the entire Membership Interest of the receiving Member (the "Offeree") for a cash purchase price set forth in the Buy-Sell Notice. The initiating Member(s) shall simultaneously provide a copy of the Buy-Sell Notice to all Members and the Company. The purchase price shall be stated in terms of the purchase price attributable to one hundred percent (100%) of all outstanding Membership Interests of the Company (the "Company Price") multiplied by the Percentage Interest of the Offeree. Purchase price shall also be pursuant to provision 10.05 and include all anticipated and known business. Within thirty (30) days after receipt of the Buy-Sell Notice, the Offeree must notify the offering Member (the "Offeror") in writing of its election to either (i) sell its Membership Interest to the Offeror at such cash purchase price or (ii) purchase the Offeror's Membership Interest for the Company Price set out in the Buy-Sell Notice multiplied by the Percentage Interest of the Offeror. If such election notice is not given within such thirty-day (30) period it shall be conclusively deemed that the Offeree has elected to sell its Membership Interest to the Offeror. The closing of the sale and purchase of the Membership Interest pursuant to this Section 10.08 shall occur on or before the expiration of ninety (90) days following the receipt by the Offeror of notice of the Offeree's election. In consideration for the purchase price, the selling Member shall convey to the purchasing Member all right, title and interest in and to the selling Member's Membership Interest, free and clear of all liens, claims and encumbrances and shall execute all instruments necessary to perfect the sale of such Membership Interest. The closing shall also include the assignment by the transferring party and its affiliates of all membership interests. The closing shall also include the assignment by the transferring party and its affiliates of all membership interests. The purchase price for the Membership Interests transferred under this Section 10.08 shall be paid in immediately available funds. At the closing, the seller shall assign to the buyer all Membership Interests free and clear of any liens, claims or encumbrances. If a party does not perform its obligations under this Section l0.08, the other party shall have the right to compel specific performance of such obligations. All parties agree that damages are an inadequate remedy for a breach of this Agreement.

Sec. Am. Pet., Ex. C., at 83-84 (emphasis omitted). In July 2024, the parties discussed the dissolution of their partnership but were unable to agree on dissolution terms. *See* SJ Mot.

at 6-7. Northern sent Crain a written proposal for the division of the NC Entities and Crain responded with various allegations of Northern's independent and unfair dealings. *Id.* at 7. Notably, Crain never lodged a formal dispute under the Company Agreements' dispute resolution clause. *Id.* On August 16, 2024, Northern as "Offeror" sent Crain as "Offeree" a Buy-Sell Purchase Offer Notice ("Offer Notice") seeking to purchase (1) Crain's 50% membership interest in NC, LLC for $1,000, (2) Crain's 50% membership interest in Realty for $35,000, and (3) Crain's 50% membership interest in Property Management for $22,000 and 50% of Property Management's net cash on hand on closing day.[4] *See id.* at 12.

¶ 11    Under the above Buy-Sell Option clause, Crain had 30 days from the date he received the Offer Notice to notify Northern his election to either (1) sell his membership interests in each NC Entity to Northern, or (2) notify Northern he elected to purchase Northern's membership interests in each NC Entity. *See* Sec. Am. Pet., Ex. C, at 84. Crain did not respond to the Offer Notice by the 30-day deadline (September 19, 2024). *See* SJ Mot. at 12. In October 2024, the parties agreed to mediate during the Company Agreements' prescribed mediation timeline. *See* SJ Mot. at 10. However, Crain failed to appear for mediation and the mediation deadline expired. *Id.* On March 13, 2025, Northern delivered cashier's checks to Crain in the amounts prescribed by the Offer Notice. *Id.* at 13. Crain never negotiated the checks, refused to close on the purchase/sale, and filed the instant lawsuit. *Id.*

---

[4] Crain received the Offer Notice on August 19, 2024. *See* SJ Mot., Ex. L, at 134.

¶ 12    As a threshold matter, the Court finds the Company Agreements serve as the NC Entities' contract governing their internal affairs and relations.   The Company Agreements show both parties were mutually obligated under the contract and sufficient consideration existed. *See Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 573 (Tex. App.—Fort Worth 2008, pet. denied).   Crain lodges a murky challenge of the Company Agreements' validity, stating he "denies that he executed, authorized, or agreed to any alleged 'Buy-Sell Purchase Offer Notices' in the manner or form alleged," but he does not provide evidence supporting the challenge.  Resp. at 2; *see*, *supra*, at n.2 (signature dates for each NC Entity's Company Agreement).   In fact, nowhere in the correspondence from Crain's counsel to Northern's counsel does Crain ever contest or question the enforceability of the Company Agreements' clauses. Instead, Crain's counsel's correspondence primarily addresses Crain's intended withdrawal from active participation in the NC Entities and potential litigation regarding the Woodhaven Project. *See* SJ Mot., Exs. H, J, Q, S, U, X, Z, at 114-24, 128, 143, 147-51, 157-58, 175-76, 178.  The Court will not invalidate the parties' agreement based on Crain's unilateral and unsupported contention.   The Company Agreements and the clauses within are legally valid.

¶ 13    Having found the Company Agreements are valid, the Court gives effect to the Buy-Sell Option clause's plain language.  Both Northern and Crain's signatures on the Company Agreements indicate they agreed to the Buy-Sell Option clause's express procedure regarding notice and membership interest forfeiture.  The pertinent language leaves little room for interpretation:

Each Member . . . [has] the right to initiate a *mandatory* buy-sell option by providing written notice.

. . .

Within thirty (30) days after receipt of the Buy-Sell Notice, the Offeree *must* notify the offering Member (the "Offeror") in writing of its election[s].

. . .

If such election notice is not given within such thirty-day (30) period it shall be *conclusively deemed* that the Offeree has elected to sell its Membership Interest to the Offeror.

. . .

The closing of the sale and purchase of the Membership Interest . . . *shall* occur on or before the expiration of ninety (90) days following the receipt by the Offeror of notice of the Offeree's election.

. . .

If a party does not perform its obligations . . . the other party *shall* have the right to compel specific performance of such obligations. *All parties agree* that damages are an inadequate remedy for a breach of this Agreement.

Sec. Am. Pet., Ex. C., at 83-84 (emphasis added). The terms are definite, unwavering, and agreed by both parties. The language's certainty and the parties' signatures demonstrate that the parties intended the buy-sell process to be streamlined and unquestionable. The Court will not rewrite unambiguous terms but will instead enforce the parties' original intent as expressed in the Company Agreements. *Neuhoff*, 569 S.W.3d at 743 (Tex. 2020). Accordingly, no genuine issue of material fact exists as to the Company Agreements' validity or its express terms.

2. Compliance and Specific Performance

¶ 14    Northern is entitled to specific performance under the express terms of the Buy-Sell Option clause. Specific performance is an equitable remedy and is used as a substitute for monetary damages when such a remedy would be inadequate. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008); *Paciwest,* 266 S.W.3d at 571. The parties agreed: the Offeror is to supply an Offer Notice to the Offeree and if the Offeree does not elect to either buy or sell his membership interests, he is "conclusively deemed" to sell his membership interests. Sec. Am. Pet., Ex. C., at 84. The parties further agreed "damages are an inadequate remedy for a breach" of the Buy-Sell Option clause. *Id.* Northern complied when he sent and Crain received the Offer Notice for each NC Entity on August 16, 2024. By wholly failing to respond to Northern with his election, Crain intentionally forfeited his membership interest in each NC Entity. Crain knew the Buy-Sell Option clause's language was unforgiving and "mandatory," and that failure to adhere to its procedures would "conclusively deem[]" membership interest forfeiture. Despite knowing and agreeing to the language, Crain purposefully declined to provide Northern his election within the agreed time period.

¶ 15    Crain appears to pick-and-choose which clauses he deems enforceable without providing any evidence sufficient to support his claims. For example, in his Second Amended Petition, Crain asks the Court to enforce the Company Agreements' clauses concerning other dealings, prohibition on disclosures, non-solicitation, etc. *See* Sec. Am. Pet., at 39-46, 54. But in his Response, he argues the Buy-Sell Option clause is not enforceable and the Court should not order specific performance because Northern breached

other Company Agreement clauses. *See* Resp. at 9. Notably, Crain never utilized the dispute resolution process contained in section 13.11 of the Company Agreements to lodge a dispute, nor did he attend mediation as prescribed by the clause. *See* SJ Mot. at 7, 10. He instead chose to wholly skirt his obligation to respond to Northern's Offer Notice. Having found the Company Agreements valid and seeking to uphold their express terms, the Court will not selectively enforce certain clauses and not enforce others. Said otherwise, Crain's allegations do not excuse avoiding the Buy-Sell Option clause's express procedure.

¶ 16    Because the summary judgment evidence demonstrates that Northern has established his full performance under the above clause and, because Crain wholly failed to respond to Northern's performance, Northern is entitled to Crain's membership interest in the NC Entities per the mandatory Buy-Sell Option clause's express language. Accordingly, Crain must sell his membership interest in the NC Entities to Northern.

> i.    *Date*

¶ 17    The Court's order of specific performance shall be dated effective December 19, 2024. Having found the Company Agreements' validity and holding true to the signatories' original intent in drafting the Buy-Sell Option clause, the Court finds enforceable the 90-day closing provision:

> The closing of the sale and purchase of the Membership Interest pursuant to this Section 10.08 shall occur on or before the expiration of ninety (90) days following the receipt by the Offeror of notice of the Offeree's election.

Sec. Am. Pet., Ex. C., at 84. Crain received Northern's Offer Notice on August 16, 2024. *See* SJ Mot., Ex. L, at 134. The closing, no matter Crain's election to buy or sell, was to

occur 90-days after receipt: December 19, 2024. Despite Northern's repeated attempts to comply with the Company Agreements and close according to the prescribed timeline, Crain never notified Northern of his election. Crain should not benefit from his failure to comport with the Company Agreements, and equity favors dating the closing as the originally prescribed 90-day date. *See Heritage Hous. Corp. v. Ferguson*, 674 S.W.2d 363, 366 (Tex. App.—Dallas 1984), writ ref'd n.r.e.)(court orders specific performance and payment of expenses incurred by plaintiffs as a result of defendant's late performance to "equalize" any losses caused by delay). There exists no genuine issue of material fact concerning the date of specific performance—the closing documents shall reflect closing on December 19, 2024.

### ii. *Valuation*

¶ 18    Still continuing to enforce the Company Agreements' plain language and the parties' original intent, valuation of each NC Entity shall comport with the Company Agreements' Section 10.05—Determination of Fair Value ("Fair Value clause") and shall exclude any valuation related to the Woodhaven Project.

The Fair Value clause states:

> **10.05 Determination of Fair Value**. The "Fair Value" of a Membership Interest shall be the amount that would be distributable to the Member holding such interest in the event that the assets of the Company were sold for cash and the proceeds, net of liabilities, were distributed to [Realty] . . . "Fair Value" is to include all tangible assets as well as intangible assets such as goodwill and reputational value. In the event of a dispute of the Members as to the Fair Value of a terminated Member's Membership Interest, each Member shall be entitled to appoint a certified public accountant (C.P.A.) to value the Membership Interest to be distributed to determine the Fair Value.

Included in the valuation, shall be all anticipated and known business dealings with a ninety (90) day protection period covering all transactions . . . All executed and finalized transactions during that protection period shall be deemed a transaction of the whole business with all Members having a proportional share of that business. After the valuations of the respective Member's C.P.A.'s exists after their respective valuations, the Member's shall initiate a legal proceeding in the District Courts of Tarrant County, Texas, for the express limited purposes of having the District Court appoint a Receiver for the expressly limited purpose of valuing the Member's Membership Interest in the Company for the purposes of this Article 10 of this Agreement. This will also include all known or anticipated deals of which the Members are a party.

SJ Mot., Ex. B, at 74-75 (emphasis omitted).

¶ 19    The Buy-Sell Option and Fair Value clauses work in tandem to create a regime and a self-executing procedure with firm deadlines.  The Offer Notice must state a cash price "pursuant to" the Fair Value clause and must "include all anticipated and known business."  SJ Mot., Ex. B, at 75.  The Fair Value clause supplies the valuation standard and the agreement's mechanism for disputing it.  *See id.*  The Buy-Sell Option clause then sets the timetable: the Offeree must elect in writing within 30 days, silence is "conclusively deemed" an election to sell, and the parties shall proceed to close on a 90-day schedule. Sec. Am. Pet., Ex. C, at 84.

¶ 20    Paralleling the Court's previous discussion regarding the Company Agreements and their respective Buy-Sell Option clauses, the Fair Value clause's terms are likewise express and agreed by both parties.  Crain argues Northern failed to adhere to the above requirements by failing to include the Woodhaven Project's purchase price in the Offer Notice.  *See* Resp. at 13.  He relies on the Fair Value clause's final sentence that membership interest valuation "will also include all known or anticipated deals of which

the Members are a party." SJ Mot., Ex. B, at 75. But the evidence before the Court does not establish the NC Entities or Northern's membership in the Woodhaven Project so as to properly include it in the Offer Notice. Northern did not breach the Fair Value clause by failing to include the Woodhaven Project valuation. Crain cannot recast his inaction and consequent forfeiture of his contract rights to dispute Northern's valuation and avoid specific performance. Accordingly, no genuine fact issue exists as to the valuation—the parties shall follow the Fair Value clause as prescribed by the Company Agreements.

### iii. Unclean Hands Allegation

¶ 21 Crain's allegation of Northern's unclean hands lacks sufficient summary judgment proof and neither creates a genuine issue of material fact nor negates equitable specific performance. "The doctrine of unclean hands operates as a bar to the equitable relief of specific performance." *Lazy M Ranch, Ltd. v. TXI Operations LP*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet. denied). The party claiming unclean hands has the burden to show that it was injured by the other party's unlawful or inequitable conduct. *Stafford v. S. Vanity Mag., Inc.*, 231 S.W.3d 530, 536 at n.4 (Tex. App.—Dallas 2007, pet. denied); *Willis v. Donnelly*, 118 S.W.3d 10, 38 (Tex. App.—Houston [14th Dist.] 2003), *aff'd in part and rev'd in part on other grounds*, 199 S.W.3d 262, 278-79 (Tex. 2006). The doctrine should not be applied "unless the party asserting the doctrine has been seriously harmed and the wrong complained of cannot be corrected without the application of the doctrine." *Paciwest*, 266 S.W.3d at 571 (*citing Dunnagan v. Watson*, 204 S.W.3d 30, 41 (Tex. App.—Fort Worth 2006, pet. denied)).

¶ 22    Crain avers there is a "genuine issue of material fact [] regarding Northern's failure to follow the terms and condition so the Company Agreements," and that the "Buy-Sell Option cannot be enforced by a member who has breached his fiduciary duties and the Company Agreements." Resp. at 17, 20. Specifically, but absent supporting evidence, he asserts Northern engaged in self-dealing and Northern failed to disclose competitive business activities like the Woodhaven Project.[5] *See id.* at 18. However, nothing before the Court establishes Northern's actions or inactions bar him from receiving Crain's membership interests in the NC Entities pursuant to the Buy-Sell Option clause. Crain has not met his burden to prove Northern caused harm so serious as to abandon the Buy-Sell Option clause's express language providing for specific performance.

## IV.    ATTORNEY FEES

¶ 23    Northern is entitled to recover attorney's fees incurred with respect to his Motion. "A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE § 38.001(8). If attorney's fees are proper under section 38.001(8), the trial court has no discretion to deny them. *See Smith v. Patrick W.Y. Tam Trust,* 296 S.W.3d 545, 547 (Tex. 2009)*; Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex. 1998). However, before a court can award attorney's fees, the party must prove the fees are reasonable and necessary. *Manon v. Tejas Toyota, Inc.,* 162 S.W.3d 743, 751 (Tex. App.—Houston [14th

---

[5] While the parties clearly dispute whether Northern's actions or inactions concerning the Woodhaven Project constitute a breach of the Company Agreements, the Court will not address the dispute in this Opinion.

Dist.] 2005, no pet.). The Texas Supreme Court has identified eight factors to consider when determining an award of attorney's fees:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*See In re National Lloyds Ins.*, 532 S.W.3d 794, 810-11 (Tex. 2017); *see also Arthur Andersen & Co. v. Perry Equip. Co.,* 945 S.W.2d 812, 818 (Tex. 1997).

¶ 24    Evidence of attorney's fees that is clear, direct, and uncontroverted is taken as true as a matter of law, especially where the opposing party had the means and opportunity of disproving the evidence but did not. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex. 1990). Testimony by an interested witness may establish the amount of attorney's fees as a matter of law only if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. *Id.*

¶ 25    Northern's counsel, Randall Schmidt ("Schmidt"), testified he has practiced law for 48 years. *See* SJ Mot., Ex. FF, at 188-91. He stated he, his co-counsel Jerold Mitchell ("Mitchell"), and his paralegals spent 53.45 hours preparing summary judgment evidence, drafting the summary judgment motion, and attending the summary judgment hearing. *See id.* at 192. He also stated the following hourly rates: Schmidt at $600/hour,

Mitchell at $400/hour, and paralegals at $150-175/hour. *See id.* Schmidt testified the total fees associated with the Motion are $25,772.50 and such fees are reasonable and necessary. *See id* at 191.

¶ 26    Crain did not offer any evidence to refute Schmidt's testimony. The evidence that $25,772.50 was a reasonable attorney's fee was clear, direct, and positive. Crain could have contested Schmidt's testimony but did not. *See Ragsdale,* 801 S.W.2d at 882. Therefore, Northern has established as a matter of law the amount of attorney's fees incurred for purposes of obtaining summary judgment.[6]

## V.    CONCLUSION

¶ 27    The Court finds no genuine issue of material fact exists as to the Buy-Sell Option clause found within the Company Agreements. The Court adheres to the clause's express language and the parties' intent and finds Northern is entitled to buy, and Crain is entitled to sell, Crain's membership interests in the NC Entities.

¶ 28    It is therefore **ORDERED** that Crain tender to Northern forms of Irrevocable Assignment of Membership Interest in the Northern Crain Entities.

¶ 29    It is further **ORDERED** that the Irrevocable Assignment of Membership Interest shall have an effective date of December 19, 2024.

---

[6] Northern's Motion also includes a general request for attorney's fees that may be incurred in the event of an appeal by Crain. SJ Mot. at 23. However, Northern failed to present any evidence of potential appellate attorney's fees. Northern's request is therefore denied.

¶ 30 It is further **ORDERED** that the Irrevocable Assignment of Membership Interest shall provide the same valuation for each NC Entity as provided in Northern's Offer Notice dated August 16, 2024.

¶ 31 It is further **ORDERED** that Northern is entitled to an attorney's fees award of $25,772.50.

SO ORDERED.

_____
Judge, Texas Business Court,
Eighth Division

SIGNED: February 2, 2026.